# EXHIBIT A

UNITED STATES BANKRUPTCY COURT

WESTERN DISTRICT OF WASHINGTON - TACOMA

------------------------------------------------------------
| | |
|---|---|
| SARAH HOOVER, | ) BK No. 19-42890-MJH |
| | ) Adv No. 20-04002-MJH |
| Debtor, | ) |
| | ) Chapter 7 |
| _____ | ) |
| | ) |
| SARAH HOOVER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| QUALITY LOAN SERVICE CORPORATION | ) |
| OF WASHINGTON, PHH MORTGAGE | ) |
| CORPORATION DBA PHH MORTGAGE | ) |
| SERVICES, HSBC BANK USA, N.A. AS | ) |
| TRUSTEE OF THE FIELDSTONE | ) |
| MORTGAGE INVESTMENT TRUST, SERIES | ) |
| 2006-2, NEWREZ, LLC, IH6 PROPERTY | ) |
| WASHINGTON, LP, DBA INVITATION | ) |
| HOMES, | ) |
| | ) |
| Defendants. | ) |

------------------------------------------------------------
Video Conference Deposition Upon Oral Examination of
30(b)(6) PHH MORTGAGE CORPORATION DBA PHH MORTGAGE SERVICES
DESIGNEE:  SONY PRUDENT
------------------------------------------------------------

(Attendance of all participants via Zoom Via Conference)

DATE:  August 12, 2020

REPORTED BY:  Christina Atencio, CCR #2749

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com      206.622.6661 * 800.657.1110  FAX: 206.622.6236

Page 2

```
 1   APPEARANCES:

 2   For the Plaintiff:

 3                   CHRISTINA LATTA HENRY, ESQ.
                     Henry & DeGraaff
 4                   787 Maynard Avenue South
                     Seattle, WA  98104
 5                   (206) 330-0595
                     chenry@hdm-legal.com
 6
 7   For Defendant IH6 Property Washington, LP DBA Invitation
     Homes:
 8
                     JOHN ANTHONY MCINTOSH, ESQ.
 9                   Schweet Linde & Coulson
                     575 South Michigan Street
10                   Seattle, WA  98108
                     (206) 381-0118
11                   johnm@schweetlaw.com

12
     For Defendant Quality Loan Service Corp. of Washington:
13
                     JOSEPH WARD MCINTOSH, ESQ.
14                   McCarthy & Holthus, LLP
                     108 First Avenue South
15                   Suite 300
                     Seattle, WA  98104
16                   (206) 596-4842
                     jmcintosh@mccarthyholthus.com
17
18   Defendants PHH Mortgage Corporation, HSBC Bank USA, N.A., as
     Trustee of the Fieldstone Mortgage Investment Trust, 2006-2,
19   and NewRez:

20                   RYAN S. MOORE, ESQ.
                     Houser LLP
21                   600 University Street
                     Suite 1708
22                   Seattle, WA  98101
                     (206) 596-7838
23                   rmoore@houser-law.com

24

25
```

                                                       Page 3

1                        E X H I B I T S
    NO.    DESCRIPTION                                  PAGES
2
    1      Amended Notice of Deposition                    6
3
    2      Special Power of Attorney                        9
4
    3      Life of Loan Memo                               12
5
    4      Plaintiff's First Set of Interrogatories        28
6           and Requests for Production to Defendant
            PHH with Responses Thereto
7
    5      First Set of Interrogatories and Requests       33
8           for Production to Defendant PHH
9   6      Email, 1/11/19 with attachments                 49
10  7      Notice, 5/13/19                                 58
11  8      Notice containing mortgage account info         59
12  9      Email, 6/21-6/26/19; Fax Cover Sheet,           63
            7/8/19; Letters, 8/2 and 8/13/19
13
    10     Fax Cover Sheet, 9/9/19; Notice of              91
14          Bankruptcy Filing; Borrower's
            Authorization Form
15
    11     Letter, 9/20/19                                 88
16
    12     Letter, 9/23/19                                 88
17
    13     Transcript of Audio Recording                  105
18
    14     Audio file                                     107
19
    15     Letter, 12/24/19                               113
20
    16     Emails, 9/19-9/27/19                           121
21
    17     Email, 1/5/20                                  130
22
    18     Limited Power of Attorney                      132
23
    19     2010 IRS Form 8879                             135
24
    20     King County Superior Court Documents           136
25          List with attached documents

1                    E X A M I N A T I O N

2

3    BY                                          PAGES

4

5    Ms. Henry.......................................4, 140

6

7    Mr. Moore.......................................137

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1                    Wednesday, August 12, 2020

2                         9:30 a.m.

3                 ---------------------

4    SONY PRUDENT,            called as a witness in the

5                            above-entitled cause, being

6                            first duly sworn, testified

7                            as follows:

8

9                    EXAMINATION

10   BY MS. HENRY:

11       Q.  Good morning.  And it's Sony?

12       A.  Yes.  Good morning.

13       Q.  Okay.  I did say it correctly.  Sorry for that.

14   And, Sony, there was an email link sent to your attorney

15   yesterday and then another one this morning that just kind

16   of updated some additional documents.  Were you able to get

17   that link and open it?

18       A.  Yes.

19       Q.  Okay.  I just wanted to make sure that you have

20   access.  Sony, I'm going to ask you to look at the document

21   that is labeled 30(b)(6) Amended Notice of PHH.  In the file

22   it's listed below the document that's numbered 30.  Do you

23   see that?

24       A.  I do.

25       Q.  I'll have you open that up.

Page 6

1       A.  I have it opened up.

2       Q.  Okay.

3           MS. HENRY:  And I'm going to have this document

4   labeled as Exhibit 1.

5           (Exhibit 1 marked.)

6       Q.  Have you seen this amended notice deposition of PHH

7   Mortgage?

8       A.  Yes.

9       Q.  And have you reviewed it in preparation for today's

10  testimony?

11      A.  Yes.

12      Q.  I'm going to have you turn to page 3 of that

13  document.

14      A.  I am there.

15      Q.  Okay.  And I'm going to go through the items in

16  Schedule A.  So are you prepared today to testify about "The

17  acquisition/referral of the account to PHH for servicing

18  and/or collection (including but not limited to the

19  acquisition of the account from Ocwen)"?

20      A.  Yes.

21      Q.  Are you prepared today to testify about "The factual

22  basis of each of the facts alleged by PHH in its answer"?

23      A.  Yes.

24      Q.  Are you prepared to testify today about your

25  "Knowledge of all actions taken by PHH or its predecessors

1   with respect to the account, including but not limited to

2   foreclosure proceedings on the property"?

3       A.  Yes.

4       Q.  Are you prepared today to testify about the

5   "Knowledge of any actions taken by QLS, NewRez, HSBC, and/or

6   IH6 or their predecessors with respect to the account"?

7       A.  Yes.

8       Q.  Are you prepared to testify today to "PHH's policies

9   and procedures with respect to initiating or directing

10  foreclosure proceedings where the borrower/owner of record

11  is deceased"?

12      A.  Yes.

13      Q.  Are you prepared today to testify to all "All

14  account notes, collection logs, miscellaneous notes, debtor

15  work cards, or other documentation methods, if any, whether

16  computerized, manual or other, of all activities undertaken

17  by PHH related to Sarah Hoover, the account, or Ali

18  Suleiman"?

19      A.  Yes.

20      Q.  Are you prepared today to testify to "PHH's document

21  retention and/or document destruction policies and

22  procedures"?

23      A.  Yes.

24      Q.  Are you prepared today to testify to the

25  "Recordkeeping methods of PHH with respect to the account"?

Page 8

1       A.  Yes.

2       Q.  Are you prepared today to testify to "PHH's

3   maintenance, storage, policies and procedures with respect

4   to ESI"?

5       A.  Yes.

6       Q.  Are you prepared today to testify to PHH's

7   communications with QLS, NewRez, HSBC, and/or IHQ or their

8   predecessors with respect to the account including the

9   foreclosure of the property?

10          MR. MOORE:  Christina, you said IHQ.  Do you mean

11   IH6?

12          MS. HENRY:  IH6, yes.

13      Q.  IH6, excuse me.

14      A.  Yes.

15      Q.  Are you prepared to testify to "PHH's communications

16   with Sarah Hoover or her representatives"?

17      A.  Yes.

18      Q.  Are you prepared today to testify to the "Knowledge

19   of PHH's responses to plaintiff's discovery requests,

20   including any documentation produced"?

21      A.  Yes.

22      Q.  Are you prepared today to testify to "PHH's actions

23   taken with respect to the surplus funds resulting from the

24   foreclosure of the property"?

25      A.  Yes.

1      Q.  The next thing I want you to look at is a document

2   labeled 1 dash power of attorney for Sarah Hoover.

3      A.  One moment.

4          MS. HENRY:  Christina, I'm going to have that

5   labeled as Exhibit 2.

6          (Exhibit 2 marked.)

7      A.  I am at that document.

8      Q.  All right.  Have you seen this document before?

9      A.  Yes.

10     Q.  Is this the document in PHH's files?

11     A.  Yes.

12     Q.  And it's marked as Defendants Bates number,

13  Defendant 0001 through 0003, correct?

14     A.  That is correct.

15     Q.  Can you state for the record what you believe this

16  document is?

17     A.  It's part of the origination that Ms. Hoover had

18  power of attorney for the borrower, Ali Suleiman.

19     Q.  Okay.  And to the best of your knowledge, that power

20  of attorney included abilities to do what on the account?

21     A.  Based on this it was for origination, it says, "for

22  my use and benefit to execute promissory notes, bonds,

23  mortgages, contracts, deeds of trust and any other

24  instruments which may be necessary or proper to purchase

25  and/or encumber the following real property."

1      Q.   Okay.  And how was this power of attorney noted on

2   the account?

3           MR. MOORE:  Objection to form.

4      A.   This power of attorney wasn't noted on the account

5   as it was a power of attorney utilized during the

6   origination when the loan originated so that Ms. Hoover

7   could sign on behalf of her father as power of attorney.

8      Q.   And did you have any other authority to talk to Ms.

9   Hoover besides this document on the account?

10          MR. MOORE:  Objection to form.  Who do you mean by

11  "you"?

12          MS. HENRY:  When I say "you," I'm talking about PHH,

13  his employer.

14     A.   She was an authorized third party on the account.

15     Q.   She was or was not?

16     A.   She was an authorized third party.

17     Q.   So maybe I'm not hearing you clearly.  She was or

18  was not?

19          MR. MOORE:  Objection to form.  At what time?  What

20  time period are we talking about?

21          MS. HENRY:  I'm not sure what he just answered, so

22  that's my next question.

23     A.   Based on my review of the Suleiman records, as of

24  January 2019, Ms. Hoover as well as her brother were

25  authorized on the account but not as borrowers on the

1    account.

2        Q.  Can you tell me what document gave them

3    authorization?

4        A.  Based on the documents that I saw, it was the death

5    certificate notifying PHH/Ocwen of the debt of the borrower

6    and an affidavit of trust.

7        Q.  But what about prior to January 2019?

8            MR. MOORE:  Objection to form.

9        Q.  Was Ms. Hoover authorized on the account prior to

10   January 2019?

11       A.  She did have authorization as a third party but not

12   as the borrower on the account.

13       Q.  So prior to 2019, what was the basis of her

14   authorization?

15       A.  I believe there was an authorization based on the

16   borrower giving consent to have her authorized on the

17   account.

18       Q.  And would that be oral consent or written consent?

19       A.  I would have to search the servicing records if you

20   have the comment logs so we can go through the comment logs.

21   I couldn't say off the top of my head.

22       Q.  So have you produced a document that shows what

23   authorization was on the account prior to 2019?

24       A.  We would have to go through the servicing notes.

25       Q.  So it would not be a document?

1      A.  It would be a document.

2      Q.  And so have you produced that document?

3      A.  Yes.  It's also a part of the documents that you

4  sent.

5      Q.  Are you aware of which document it is?

6      A.  One moment.

7          MR. MOORE:  Christina, if you want to put a document

8  in front of him, we could do that.

9          MS. HENRY:  Obviously, I thought I had; that's why

10  I'm asking him.  He's telling me that that is not the

11  appropriate document and that he has produced some other

12  document.  And so I'm asking him which document that is.

13     Q.  And so you're able to look at the documents that you

14  provided; is that correct?

15     A.  In reviewing the servicing notes, which would have

16  any interaction that's completed on the account.

17     Q.  Okay.  So let's get the servicing notes into the

18  record.  So I'm going to turn you to one of the documents

19  labeled number 4 that is going to be now Exhibit 3.

20         (Exhibit 3 marked.)

21     Q.  So is Exhibit 3 the servicing notes that you are

22  referring to?

23     A.  Yes.

24     Q.  Okay.  So we can also take a break for a minute if

25  that's something you want to review.

Page 13

1    A.  Yes.  I would have to go through the review to see

2    when authorizations were approved on the account.

3         MS. HENRY:  Okay.

4         MR. MOORE:  You want to take a break, Christina, and

5    we'll come back.

6         MS. HENRY:  Yeah.  We'll take a break for five

7    minutes and come back in five.

8         MR. MOORE:  Okay.

9         (Brief recess.)

10   Q.  So you were looking to tell me what was the basis of

11   Ms. Hoover's authorization prior to January 2019 and you

12   found that place in the notes in Exhibit 3?

13   A.  There is a comment in which on page 46 of Exhibit 3

14   in which the call in; authorized third party call; talked to

15   Leo who verified the full borrower's last name, last 4

16   digits of the social security number.

17   Q.  So on page 46.  And what is the date?

18   A.  It is June 15th, 2018.

19   Q.  Do you know the time?

20   A.  5:41, 13 seconds p.m.

21   Q.  Okay.  "Authorized third party call; talked to Leo

22   Hoover and verified the full borrower name, last four digits

23   of the borrower's social."

24        Okay.  So I'm confused.  So the borrower called in?

25   A.  No.  It says, "authorized third party call; talked

Page 14

1   to Leo Hoover."

2        Q.   And who is the authorized third party?

3        A.   The authorized third party is stated as Leo Hoover.

4        Q.   And how is he authorized?

5        A.   I didn't see how the authorization came through.

6        Q.   So you don't know how Leo Hoover was authorized or

7   how Sarah Hoover was authorized prior to January 2019,

8   correct?

9             MR. MOORE:  Objection to form.

10       A.   I don't recall seeing anything in the servicing

11  notes that I'm reviewing.

12       Q.   And so what you're pointing me to is a phone call.

13  So to the best of your knowledge, does a phone call

14  authorization stay in the file for more than 24 hours?

15       A.   The policy and procedure for a third party

16  authorization is that the borrower would at some point would

17  have to authorize the third party.

18       Q.   And then that borrower is authorized on the account

19  forever?

20       A.   The borrower determines how long the authorization

21  should remain on the account.  It could be one day, it could

22  be for three months, or it could be for a year, or it could

23  be revoked at any time.

24       Q.   And that's something that doesn't have to be done in

25  writing?

1      A.  It can be verbal.

2      Q.  It can be verbal.  And you have a policy and

3  procedure about that?

4      A.  There is a policy and procedure for authorizing a

5  third party on your account.

6      Q.  And have you produced that procedure?

7      A.  I don't believe any policy and procedures have been

8  produced yet.

9      Q.  And is that a procedure that you -- is there a

10  reason you have not produced that procedure?

11      MR. MOORE:  Objection to form.  He's not the

12  attorney.

13      MS. HENRY:  I'm asking him if he knows why he has

14  not produced the procedure.

15      A.  The procedures haven't been produced as I believe

16  there is a back and forth discussion between counsel and the

17  courts as to how to produce those policies and procedures.

18      Q.  But they haven't been produced to date, correct?

19      A.  No, they haven't.

20      Q.  But they are part of the documents that you are

21  planning to produce subject to a protective order that has

22  not been entered, correct?

23      A.  Once the attorneys have discussed how those

24  documents will be produced, they will be produced.

25      Q.  Okay.  Before we go forward, I'm going to back up

1    and I'm going to ask you how long have you been in your

2    current position?

3        A.  Over seven years.

4        Q.  And who do you work for?

5        A.  Ocwen Financial Corporation.

6        Q.  And can you tell me what is the relationship between

7    Ocwen and PHH Mortgage Corporation?

8            MR. MOORE:  Objection.  Christina, when you say

9    "Ocwen," I just want to be precise because there are

10   multiple Ocwens.  Do you mean Ocwen Financial Corporation or

11   Ocwen Loan Servicing, LLC?

12           MS. HENRY:  Well, for the moment, I meant the Ocwen

13   that he was saying he worked for.

14           MR. MOORE:  Okay.

15           MS. HENRY:  So we can differentiate that in a

16   minute.

17       Q.  But for the moment Ocwen Financial Corporation, what

18   relationship does it have to PHH Mortgage Corporation?

19       A.  PHH Mortgage Corporation is a wholly owned

20   subsidiary of Ocwen Financial Corporation.

21       Q.  And your counsel just mentioned another subsidiary

22   of Ocwen.  I think he said Ocwen Loan Servicing; is that

23   correct?

24       A.  Ocwen Loan Servicing, LLC.

25       Q.  Is that entity still in existance?

1      A.  It merged with and into PHH as of June 1st, 2019.

2      Q.  And is there any other Ocwen subsidiaries that are

3  relevant to the account?

4      A.  They would be overseas subsidiaries.

5      Q.  And what does an overseas subsidiary mean?

6      A.  Other locations for Ocwen such as in India or

7  Philippines or other places that it does business.

8      Q.  What would be the names of those subsidiaries, just

9  as example?

10         MR. MOORE:  And, Christina, you're saying only as

11  they relate to this account, correct?

12         MS. HENRY:  If he knows of one that relates to this

13  account, then preferably that one, otherwise he can give me

14  an example of what an overseas subsidiary --

15         MR. MOORE:  I just object to the extent it goes

16  beyond the account, I'd say it exceeds the scope.

17         MS. HENRY:  Well, if he knows the account, that's

18  all I want.

19      Q.  So are there any overseas subsidiaries for Ocwen

20  that services an account?

21      A.  To my knowledge, not that I know of.

22      Q.  Okay.  Are there any overseas -- I don't know if you

23  call them customer servicing reps or what their title is

24  that services an account?

25      A.  If a customer contacts PHH, or formally Ocwen, they

1    could be connected to an overseas associate.

2        Q.  And those people would work for Ocwen Financial

3    Corporation or some other subsidiary?

4        A.  I don't know who they would work for.

5        Q.  And what do you do in your position at Ocwen --

6    again, when I say "Ocwen" going forward, I'm talking about

7    the current Ocwen, Ocwen Financial Corporation?

8        A.  I am a senior loan analyst.

9        Q.  A senior loan analyst?

10       A.  Yes.

11       Q.  Tell me, what are your activities or what is the

12   basis of your job activities?

13       A.  I am assigned a portfolio of loans that are in

14   litigation for review and assisting with the litigation

15   process by reviewing applicable business records, providing

16   deposition testimony, appearing in court for trials,

17   settlement conference mediations, reviewing affidavits,

18   discovery responses, assisting with the litigation process

19   as well as any special projects assigned by in-house counsel

20   or my supervisor.

21       Q.  Okay.  And how long have you been in this position?

22       A.  Since I started with Ocwen.

23       Q.  For seven years?

24       A.  Yes.

25       Q.  So you've always been in preparing for litigation,

Page 19

1   correct?

2       A.  Yes.

3       Q.  So --

4       A.  Assisting with the litigation process.

5       Q.  So to clarify, you've never worked in loan servicing

6   at Ocwen, correct?

7       A.  I am in the -- what do you mean by "loan servicing"?

8           MR. MOORE:  Objection to form.

9       Q.  You've never actually serviced residential loans,

10  correct?

11          MR. MOORE:  Objection to form.

12      A.  I do work with all of the residential loans as I

13  have access to all of the servicing systems utilized by PHH/

14  Ocwen.  I have a username/password.  I'm able to access all

15  of the records, review the imaging system as well as all of

16  the tools utilized by various departments within Ocwen.

17      Q.  Yes, but you don't input new data into any of the

18  systems for any purpose, correct?

19      A.  No.

20      Q.  So you don't actually make the entries -- or you've

21  never made the entries even in a prior job that are on this

22  Life of Loan notes and memos, documents, Exhibit 3, correct?

23      A.  No, I have not made any of the entries on Exhibit 3.

24      Q.  And you've never talked to consumer customers,

25  correct?

1    A.  I do not have direct communication with customers

2  outside of litigation.

3    Q.  Now, you mentioned previously that there was a

4  merger between Ocwen and PHH sometime in 2019, correct?

5    A.  Correct.

6    Q.  So did you work for PHH or did you work for Ocwen

7  previously?

8    A.  I always worked for Ocwen Financial Corporation.

9    Q.  Okay.  And prior to sometime in May, late May or

10  June, Ocwen Loan Servicing no longer existed, correct?

11    A.  As of June 1st, 2019 Ocwen Loan Servicing merged

12  into PHH.

13    Q.  So Ocwen Loan Servicing does the day-to-day

14  servicing -- or did the day-to-day servicing of consumer

15  accounts, right?

16    A.  Ocwen Loan Servicing was the servicer prior to PHH.

17    Q.  And Ocwen Financial Corporation was always in

18  existance as a separate entity?

19    MR. MOORE:  Objection to form.

20    A.  Ocwen Financial was a separate legal entity.

21    Q.  Okay.  And what is Ocwen Financial Corporation's

22  function?

23    A.  Ocwen Financial Corporation is a financial holding

24  company through its various subsidiaries where it services

25  and originates loans.

1      Q.  How many employees are at Ocwen Financial

2  Corporation?

3      A.  I don't know.

4      Q.  Well, ten?  Twenty?  A hundred?

5      A.  More than a hundred but I couldn't say precisely how

6  many employees.

7      Q.  And what is the function of those employees at Ocwen

8  Financial Corporation as a holding company?

9          MR. MOORE:  Objection to form.

10     A.  I don't know who all of the employees are but there

11  is -- I'm in part of the legal department.  There is

12  corporate governance, the executive office.

13     Q.  Well, that actually is answering my question.  So

14  the corporate governance, the legal department.  What were

15  the other things you said?

16     A.  The executive board.

17     Q.  Executive board.  Those are the functions that held

18  in the holding company?

19     A.  Not all of them.  Those are the ones that I can

20  think of.

21     Q.  But the servicing of the loans is not in the holding

22  company, correct?

23     A.  It is -- no, it is not done by Ocwen Financial

24  Corporation.

25     Q.  And where did you work prior to Ocwen?

Page 22

1      A.   Bank of America N.A.

2      Q.   What did you do at Bank of America?

3      A.   My final title was process support specialist.

4      Q.   What did you do as a process support specialist?

5      A.   I handled portfolio loans that were in delinquency

6   to review those loans for loss mitigation options.

7      Q.   What years were you there?

8      A.   From August 2010 to December 2012.

9      Q.   Okay.  And so with loss mitigation, what does that

10  entail?

11     A.   That entails gathering the documents for the home

12  owner such as the RMA, proof of income, and all applicable

13  documents, submitting it to underwriting and seeing whether

14  they qualified for the government modification, HAMP.  If

15  they didn't qualify for it, I would calculate the income and

16  review them for a traditional loan modification based on

17  investor guidelines for their particular loan.

18     Q.   Okay.  Sorry.  Go ahead.

19     A.   If they did qualify, I would send out a trial

20  modification agreement and monitor them as they make the

21  three trial payments and then send a permanent loan

22  modification agreement.

23     Q.   Okay.  Did you have any interaction with directing

24  loans for foreclosure?

25     A.   No.

1    Q.  Did you have any interaction with the foreclosure

2    process at all?

3    A.  For Bank of America or Ocwen?

4    Q.  Yes, Bank of America.

5    A.  No.

6    Q.  And what about before 2010?

7    A.  Before 2010, I was with T-Mobile USA.

8    Q.  So not in banking?

9    A.  Not in banking.

10   Q.  And so could I ask about your education?  What is

11   your last degree or type of education?

12   A.  I haven't completed my degree, some college.

13   Q.  And how many years of college?

14   A.  About a year and a half to two.

15   Q.  Where did you go to college?

16   A.  St. Thomas University.

17   Q.  Okay.  And approximately how many depositions have

18   you done since you've worked at Ocwen Financial Corporation?

19   A.  I can't recall all of them off the top of my head

20   but I would say over 20.

21   Q.  Outside of depositions, what do you spend your time

22   on?

23   A.  When I'm not doing a deposition?

24   Q.  Um-hmm.

25   A.  I am researching and reviewing the accounts that I'm

Page 24

1    assigned, responding to emails based on questions on those

2    accounts as well as reviewing discovery responses,

3    recompiling payment histories, working with various

4    departments at Ocwen to solve issues that are ongoing,

5    executing settlement agreements.

6        Q.   Have you ever testified at trial?

7        A.   Yes.

8        Q.   How many trials have you testified at?

9        A.   Over 300.

10       Q.   So only 20 depositions but you've done over 300

11   trials?

12       A.   That I can recall.  Only 20 depositions because I

13   can't recall all the depositions.  It's been several years.

14       Q.   Sure.  But you readily knew it was about 300 trials.

15   So you didn't do a deposition for every trial?

16       A.   No.  Every trial did not require a deposition.

17       Q.   Okay.  And what kind of trials were those 300

18   trials?

19            MR. MOORE:  Objection to form.

20       A.   They are various trials.  Some were foreclosure,

21   some were bankruptcy, some were as a subpoenaed witness on

22   behalf of the company, some were adversarial proceeding,

23   appearing before magistrates; so it's a variance of trial

24   for different issues related to litigation.

25       Q.   Were all of those where Ocwen was the plaintiff or

Page 25

1   Ocwen was the defendant?

2            MR. MOORE:  Objection to form, compound.

3       A.   Some Ocwen -- not Ocwen directly -- but the investor

4   to Ocwen is the representative as the plaintiff; in others,

5   Ocwen and the investor are the defendants.

6       Q.   Do you know approximately how many were situations

7   where Ocwen was a defendant in litigation?

8       A.   I couldn't recall off the top of my head.

9       Q.   More than 50 percent?  Less than 50 percent?

10      A.   I couldn't quantify the number of times.

11      Q.   Okay.  So how many trials were done since January

12  1st of 2020?

13      A.   There haven't been many trials that I've done this

14  year due to COVID-19.

15      Q.   Okay.  So approximately how many?

16      A.   I don't think I've done a trial this year.

17      Q.   Okay.  What about last year?

18      A.   Last year perhaps three or four of my matters

19  actually went to trial.

20      Q.   Have you ever done a trial in Washington State?

21      A.   Yes.

22      Q.   Okay.  And do you know the name of that trial -- or

23  the name of that case?

24      A.   I believe it was HSBC Bank N.A. as Trustee versus

25  Kim -- I can't remember the borrower's name.

Page 26

1      Q.  Was that something that when we take a midday break

2   or a lunch break, that you could look that case number up?

3      A.  I would have to search through my records.

4          MR. MOORE:  Objection.

5      Q.  Is that something you could supply me?

6          MR. MOORE:  That exceeds the scope of this 30(b)(6).

7          MS. HENRY:  It goes to the nature of his knowledge.

8          MR. MOORE:  I respectfully object.  I think it

9   exceeds the scope.  Go ahead.

10     Q.  I'm asking if you could provide it, Mr. Prudent?

11         MR. MOORE:  Provide what?

12     Q.  The case number for the case that he testified in in

13  Washington?

14     A.  I would have to search my records.

15     Q.  Okay.  Thank you.  I am requesting that.

16         So let's go back to this Exhibit 3, Life of Loan

17  notes and history.  Can you tell me what this document is?

18     A.  It is the servicing notes for the account at issue.

19     Q.  And servicing notes, is that compiled from what

20  system at Ocwen?

21         MR. MOORE:  Objection to form.

22     A.  At this time PHH, prior was Ocwen Loan Servicing,

23  LLC.  Ocwen Loan Servicing, LLC utilized real servicing as

24  the servicing platform.

25     Q.  Okay.  And so what happened when PHH took over?

1    A.  Once the merger, it was converted into PHH Servicing

2  Platform MSP.

3    Q.  And so you're telling me every document here

4  represents information from MSP?

5         MR. MOORE:  Objection to form.

6    A.  Yes, this is the information from MSP.

7    Q.  And MSP stands for what?

8    A.  Mortgage Servicing Platform.

9    Q.  So we've had other testimony in this case from other

10  defendants that they used a platform called LPS.  Are you

11  familiar with LPS?

12   A.  Yes.

13   Q.  Do you know what LPS stands for?

14   A.  LoanSphere.

15   Q.  LoanSphere.  And so where are the servicing notes

16  for LoanSphere?

17        MR. MOORE:  Objection to form.

18   A.  LoanSphere isn't one with servicing notes.  It's a

19  vendor portal, which is utilized for when a loan is in

20  bankruptcy or foreclosure, if affidavits are needed.  In the

21  State of Washington, it will be a notice of default,

22  rescission, or other documents that will be executed, imaged

23  into the imaging system and notes placed in MSP regarding

24  the document that was executed.

25   Q.  So is it possible to get information directly from

1    LPS and provide it as a printout of communications for this

2    account?

3         A.  I don't know if that's possible.

4         Q.  And can I ask you why you don't know if that's

5    possible?

6         A.  That's never been requested.

7         Q.  Well, it was something that was requested in this

8    litigation.

9         MR. MOORE:  Objection to form.

10        Q.  Are you aware that that was requested in this

11   litigation?

12        A.  No, I was not.

13        MS. HENRY:  So why don't we go to what's listed as

14   document 31 and have that be Exhibit 4.

15        (Exhibit 4 marked.)

16        A.  I'm there.

17        Q.  And so Exhibit 4 is discovery, Plaintiff's First Set

18   of Interrogatories and Requests for Production to PHH with

19   Responses Thereto.  Have you reviewed this in preparation

20   for today's testimony?

21        A.  Yes.  I am the one that verified this.

22        Q.  Okay.  So I'm going to ask you if you have reviewed

23   this in advance of today's testimony and if you have any or

24   have thought about, prior to me asking you questions, any

25   supplements or changes that need to be made to this

1    document?

2        A.  I reviewed it prior but I would have to review it

3    again to see if there are any changes that would need to be

4    made.

5        Q.  All right.  Well, we can go through them one by one.

6    Interrogatory 1, people that participated.  So yourself.

7    And it says here that you're the only one that answered

8    these questions; is that right?

9        A.  Yes, with the assistance of counsel.

10       Q.  Assistance of counsel, meaning Mr. Moore?

11       A.  Yes.

12       Q.  So is that a change that needs to be made to this

13   answer?

14       A.  I don't think that would as I was the one verifying

15   it, but I did discuss it with him.

16           MR. MOORE:  Yeah, and I would just instruct the

17   witness not to obviously divulge any attorney-client

18   communication.

19           MS. HENRY:  Sure.  But to the extent you helped

20   answer, that answer does not say so, so I'm requesting that

21   that be clarified.

22       Q.  In any case, did you speak with anyone else --

23   should I call you -- well, I'm going to call you, Mr.

24   Prudent.  I'm sorry.  It's easier for me.

25       A.  It's all right.

1    Q.  So, Mr. Prudent, can you tell me if you talked with

2   anyone else at Ocwen or PHH regarding your responses to

3   discovery, written discovery?

4    A.  The only person I've attempted to communicate with

5   was Shelly Robertson but I haven't heard back from her yet.

6    Q.  But at the time you did these responses to

7   discovery?

8    A.  No.  That is after I verified these responses to

9   discovery.

10   Q.  So in preparation for today's testimony, did you

11   speak with anybody at PHH?

12   A.  No.

13   Q.  Concerning this account?

14   A.  No.

15   Q.  And did you speak with anybody at QLS concerning

16   this account?

17   A.  No.

18   Q.  Did you speak to anybody at Ocwen Financial

19   Corporation concerning this account?

20   A.  No.

21   Q.  Why not?

22      MR. MOORE:  Objection to form.

23   A.  The account is serviced by PHH and I reviewed all of

24   the records associated with this account.

25   Q.  So is PHH -- people that work for PHH are the only

1  ones that handled anything to do with this account; is that

2  correct?

3      A.  As far as servicing the account, the employees of

4  PHH are the ones that input the information into the

5  servicing platform.

6      Q.  So when we say "servicing," does servicing include

7  issues dealing with foreclosure?

8      A.  Yes.

9      Q.  So all issues that -- strike that.

10         So does Ocwen Financial Corporation have any

11  interaction with nonjudicial foreclosing trustees in

12  Washington for accounts being foreclosed in Washington?

13         MR. MOORE:  Objection to form.

14      A.  Ocwen Financial Corporation doesn't have

15  communication with foreclosure trustees in the State of

16  Washington.

17      Q.  What about for this account, did anybody at Ocwen

18  Financial Corporation have any interaction with Washington

19  State Foreclosure trustees, in this case Quality Loan

20  Service for this account?

21      A.  The interaction would have been through Ocwen Loan

22  Servicing, LLC and then PHH.

23      Q.  So only people who worked for PHH would be involved

24  in either servicing or issues dealing with foreclosures for

25  this account, correct?

1      A.  Correct, because PHH is the servicer for the

2  account.

3      Q.  Okay.  So Number 2 in your interrogatory you say

4  that -- it asked when PHH learned about Mr. Suleiman's

5  death.  And you say here that you learned in June of 2019;

6  is that correct?

7          MR. MOORE:  That's not what it says.

8          MS. HENRY:  Oh.  Began servicing in June 2019.  I'm

9  sorry.

10     A.  Yes.

11     Q.  So --

12     A.  In June of 2019.

13     Q.  So when did you learn about Mr. Suleiman's death?

14     A.  PHH learned about the death sometime in August of

15  2019.

16     Q.  Okay.  So I'm going to take you back up to the --

17         I don't think you have the original information

18  here.  So to the best of your knowledge, when PHH was

19  mentioned in these interrogatories and requests for

20  production, did that also include interactions with Ocwen

21  Financial or Ocwen Servicing -- Loan Servicing?

22         MR. MOORE:  Objection to form.  Christina, you can

23  ask him when Ocwen Loan Servicing, LLC first knew about Ali

24  Suleiman.  Just ask him.

25         MS. HENRY:  That's not what I'm asking.

1         MR. MOORE:  Okay.

2    Q.  So let me help you for a minute.  So I imagine if

3 you look in that link that was given to you previously.

4    A.  Um-hmm.

5    Q.  And I think if you -- I think if I name this 36

6 right now, tell me if you can see it.  If not, I'll send

7 this to your attorney?

8    A.  You said 36?  I don't see --

9    Q.  Right.  I'm going to send this to the attorneys and

10 they can forward it on to you.

11        THE WITNESS:  Could we take a quick break?

12        MS. HENRY:  Sure.  So I'm going to send this and

13 then we'll take another five minute break and take a look at

14 it and then we'll come back and I'm going to ask you to

15 focus on the definitions.

16        THE WITNESS:  Okay.  Thank you.

17        (Brief recess.)

18        (Exhibit 5 marked.)

19    Q.  I just realized, Sony, that I just wanted you to

20 have the actual definitions in front of you for the various

21 names of things as we went through the Interrogatories and

22 Requests for Production in Exhibit 4.  So Exhibit 5 has

23 those definitions.

24    A.  Okay.  I have it.

25    Q.  Okay.  So I'm going to go back to Exhibit 4.  I just

Page 34

1    wanted you to have that handy.

2        A.  Okay.

3        Q.  So you were testifying about Interrogatory 2.

4        A.  Yes.

5        Q.  So you said that PHH didn't learn about Mr.

6    Suleiman's death until August of 2019?

7        A.  Yes, that's when PHH first learned of his death.

8        Q.  So let me understand something.  PHH merged with

9    Ocwen, right?

10       A.  Yes.

11       Q.  And so there wasn't a transfer.  They actually are

12   the same entity, aren't they?

13       A.  They would be, as my understanding of how a merger

14   works.

15       Q.  So when you say that PHH learned of the deceased in

16   August 2019, would that include anything that the prior

17   Ocwen Loan Servicing understood about Mr. Suleiman's death?

18       A.  When I responded to this response, I was only

19   responding on behalf of PHH and not Ocwen Loan Servicing,

20   LLC.

21       Q.  But they are the same entity, are they not?

22       A.  Yes.

23       Q.  Okay.  We'll come back to that.  So they didn't

24   learn about it until August of 2019 and servicing for PHH as

25   the new entity started on June 1st, 2019?

Page 35

1    A.  Yes.

2    Q.  Let's go down to Interrogatory Number 3.  And then

3  how did you receive notice of Mr. Suleiman's death and who

4  were the potential heirs, Interrogatory 3?

5        MR. MOORE:  Christina, are you just asking him to

6  read this and make sure nothing has changed?

7        MS. HENRY:  I'm asking him if this is the same

8  information as before?

9        MR. MOORE:  I believe he already testified that

10  nothing has changed.  If you want to point him to a specific

11  one, this just seems like --

12        MS. HENRY:  I'm actually asking him for a reason.

13  We just found out new information a minute ago, so we're

14  going through this.

15    A.  Give me a moment to read Interrogatory Number 3.

16  (Witness reviews document.)  What was your question?

17    Q.  So you responded to Interrogatory 3 that Ocwen,

18  which in this case you're referring to as the entity that

19  serviced the loan prior to June 1st, 2019, correct?

20    A.  Yes, Ocwen Loan Servicing, LLC serviced the loan

21  prior to June 1st, 2019.

22    Q.  So you say that they learned about Mr. Suleiman's

23  death through credit reporting on the loan?

24    A.  Through credit reporting there was mention of Mr.

25  Suleiman being deceased.

1    Q.  And so when that happens, how is that notated on the

2  loan?

3         MR. MOORE:  Objection to form.

4    A.  In comments as part of credit reporting, there would

5  be a notation that the borrower appears to be deceased.

6    Q.  And approximately when did that happen on this loan?

7    A.  I don't recall the exact time frame that that

8  happened.

9    Q.  How often does Ocwen at that time check credit

10 reports?

11        MR. MOORE:  Objection to form.  You mean at the time

12 of Mr. Suleiman's death?

13        MS. HENRY:  Well, they checked a credit loan and

14 they found out about his loan.  Why were they checking his

15 credit report?

16   A.  I think there's a mistake in that there wasn't a

17 check of the credit reporting.  It was normal reporting

18 that's done on the account.  And as part of that

19 information, that was notated on the account.

20   Q.  So what does normal reporting mean?

21   A.  Ocwen at the time, as servicer, reports on the

22 account every month whether the payments are being made in

23 accordance with the terms of the loan documents or if the

24 account is in default.

25   Q.  So if the account is current, do they check credit

1    reporting monthly?

2         A.   The account is still reported every month to the

3    credit bureaus whether it's delinquent or current.

4         Q.   Okay.  So either way, Ocwen checks monthly to the

5    credit bureaus regarding this account -- or did check for

6    this account monthly, correct?

7         A.   Again, Ocwen isn't pulling his credit report.  Ocwen

8    is reporting the information to the credit bureau so the

9    information is facilitated back to Ocwen.

10        Q.   So then when your notation here says that they were

11   alerted to Mr. Suleiman's death through credit reporting,

12   what event are you referring to?

13        A.   There was a notation on the account that the

14   borrower may be deceased based on credit reporting.

15        Q.   And so that would not be a report that Ocwen makes

16   to the credit bureau; it would be some other type of

17   reporting, correct?

18        A.   It would be information in the reporting system.

19   For credit reporting, yes.

20        Q.   So can you tell me where you got that information to

21   respond to this interrogatory?

22        A.   Again, from the servicing notes.

23        Q.   Do you know the date?

24        A.   Off the top of my head, no.

25        Q.   And do you know if that was credit reporting that

1    Ocwen does to determine -- I mean besides reporting --

2    strike that.

3          Besides reporting monthly to the credit reports,

4    does Ocwen pull credit reports for borrowers?

5          MR. MOORE:  Objection to form, overly broad.

6      A.  If there's a business need.

7      Q.  So is that what happened here?

8      A.  I don't believe I saw anything relating to the exact

9    reason as for why that was notated there.

10     Q.  You don't have any document that would tell you why?

11     A.  Not that I've seen.

12     Q.  Okay.  So you don't know why it was reported that he

13   was dead.  So then you say here that Leo and Sarah submitted

14   loan modification materials in 2018, correct?

15     A.  Correct.

16     Q.  Why would they submit loan materials -- or loan

17   modification materials in 2018 for this loan?

18     A.  They were seeking a loan modification.

19     Q.  And are they borrowers on the account?

20     A.  No.

21     Q.  And were they evaluated for a loan modification?

22     A.  I don't recall the exact determination for that loan

23   modification, if it was denied or approved.

24     Q.  And you say here, "following Mr. Suleiman's death,

25   in which Mr. Ali Suleiman purportedly signed," what do you

1   mean by "Ali Suleiman purportedly signed"?

2        A.   There appears to be his signature on the document.

3        Q.   Do you know which document you're referring to?

4        A.   The loan modification affidavit form.

5        Q.   Okay.  Is that something that you can point me to?

6        A.   I don't know if that's part of the documents that

7   are in the exhibits for this deposition.

8        Q.   So is that a document you actually reviewed in order

9   to answer this question or just looking at the notes?

10        A.   That's a document I actually reviewed.

11             MR. MOORE:  I'll represent, we produced that

12   document, Christina.

13             MS. HENRY:  Okay.  I'm just asking if he actually

14   reviewed it when he answered this question.

15        Q.   So what does Ocwen do when you find out that a

16   borrower is deceased?

17        A.   When Ocwen is notified by a third party that the

18   borrower is deceased, Ocwen requests certain documents, such

19   as a death certificate, to then update the account and to

20   show that any documents are provided to ensure that whether

21   it is in probate there is an executor to the estate or a

22   successor-in-interest.

23        Q.   And did that happen on this account?

24        A.   In January of 2019 the death certificate for Mr.

25   Suleiman was provided.

Page 40

1    Q.  But what about when they learned about it through

2  credit reporting?

3    A.  That is with the reporting there was no direct

4  notification from anyone related to the borrower that he was

5  deceased and that a death certificate was provided notating

6  that he was deceased.

7    Q.  Okay.  But you're telling me that Ocwen -- or now

8  PHH -- knew about his death prior to 2019; is that right?

9       MR. MOORE:  Objection to form.

10    A.  As I said, I don't recall the exact time.  But there

11  was reporting stating that he was deceased.  But that is

12  reporting, not an actual person related to Mr. Suleiman or a

13  third party, providing any documents verifying his death.

14    Q.  So can you clarify during the lunch break as to the

15  date that Ocwen knew about his death through credit

16  reporting?  Is that something you can look up and be

17  prepared to testify about?

18    A.  I would have to look at the records and see if I

19  find the exact date.

20    Q.  Correct.  So I'm asking you to do that during the

21  lunch break.  Is that something you can do?

22    A.  Yes.

23    Q.  We'll come back to that.  Does Ocwen, and now PHH,

24  independently do anything to investigate whether or not a

25  probate has been started when someone dies?

Page 41

1         MR. MOORE:  Objection to form.

2     A.  Not that I've ever seen.

3     Q.  No?  So you rely on heirs or other third parties to

4  give them information about when somebody dies; is that

5  right?

6     A.  To provide the necessary documents when a borrower

7  is deceased for a loan that it's servicing, yes.

8     Q.  And I'm going to refer to PHH now because I consider

9  them to be the same entity.  So when I say "PHH," I mean the

10  predecessor Ocwen Loan Servicing, just so you understand my

11  terminology.  So does PHH look for death certificates?

12     A.  Individually it doesn't search for death

13  certificates.

14     Q.  And why not?

15         MR. MOORE:  Objection to form.

16     A.  That's not a function of servicing the loan, to

17  search for death certificates.

18     Q.  Okay.  What about prior to a foreclosure, does PHH

19  look for death certificates prior to a foreclosure referral?

20         MR. MOORE:  Objection to form.  When you say "look

21  for," Christina, do you mean just on its own?

22         MS. HENRY:  Yes.

23     A.  Not that I'm aware of.

24     Q.  So in this file when this loan was referred for

25  foreclosure, was PHH aware that Mr. Suleiman was deceased?

1      A.  The exact date that PHH/Ocwen became aware was

2   January 2019 through the receipt of a death certificate that

3   the borrower had been deceased.

4      Q.  But your prior testimony in this interrogatory is

5   that you heard earlier, correct?

6          MR. MOORE:  Objection to form.

7      A.  What it says is that through reporting, there was

8   mention of a borrower being deceased.

9      Q.  Okay.  So at the time of the referral to

10  foreclosure, PHH was not aware of Mr. Suleiman's death,

11  correct?

12     A.  PHH didn't have the death certificate at the time,

13  no.

14     Q.  And when was that referral?

15     A.  I don't recall off the top of my head, the exact

16  date of the referral to foreclosure.

17     Q.  If I said it was August in 2018, would that be about

18  the time frame?

19     A.  I would have to look at the documents to verify that

20  date.

21     Q.  So was it in 2018 or 2019?

22     A.  I believe it was in 2018.

23     Q.  Okay.  I'm going to now go back to Exhibit 3, the

24  Life of Loan history document.  So you testified -- or I

25  asked you before about the LPS system, correct --

Page 43

1    LoanSphere, you said?

2        A.  Yes.

3        Q.  And I asked you to tell me whether or not documents

4    could be retrieved from it -- or notes could be retrieved

5    directly from it.  Are you aware of that, whether or not

6    that's possible?

7        A.  I believe I answered earlier.  As I stated, I don't

8    know if it's possible to retrieve notes from that system.

9        Q.  Okay.  Is that something you can find out?

10       A.  Yes, it's something that I can research.

11       Q.  Okay.  So if you're on the LPS system -- have you

12   ever used it yourself?

13       A.  In the past, yes.

14       Q.  Have you ever reviewed it?

15       A.  Reviewed it in the past, yes, but not for Ocwen.

16       Q.  So you didn't review LPS in preparation for today's

17   testimony or anything in preparation for this file or this

18   account, correct?

19       A.  I'm not sure I understand that question.

20           MR. MOORE:  Objection to form.

21       Q.  Did you review the LPS system prior to today's

22   testimony for this account?

23       A.  I don't have access to LPS.

24       Q.  You don't have access to LPS?

25       A.  No.

Page 44

1      Q.   Who would have access to LPS?

2      A.   The various departments that utilize LPS.

3      Q.   And those departments are?

4      A.   I believe foreclosure and contract management, are

5   the two I can think of off the top of my head.

6      Q.   And did you talk to anybody in the foreclosure

7   department prior to today's testimony?

8      A.   As I stated before, I didn't speak with anyone about

9   this loan.

10      Q.   So people that worked on this account -- worked on

11   the LPS system who were in the foreclosure department, do

12   they see the same notes that you've provided today in the

13   Life of Loan Memo?

14      A.   They would have access to MSP to review all of these

15   same notes, yes, and put notation for the account as well

16   for any interactions that they completed on the account.

17      Q.   But when they're in the LPS system, do they see

18   those notes?

19      A.   They are two different systems.

20      Q.   Correct, that's my question.  So would information

21   about the fact that Mr. Suleiman was deceased be in the LPS

22   notes?

23           MR. MOORE:  Objection to form.

24      A.   Again, I don't know if there are actual notes in

25   LPS.

Page 45

1    Q.  So which of this information here would reflect the

2    notes from LPS?  How do I know that something is from LPS

3    from this Life of Loan Memo?

4         MR. MOORE:  I'm going to object to form.

5    A.  I would have to go through the Life of Loan notes to

6    see if there was mention of notes from LPS.

7    Q.  Okay.  Let's go to January of 2019 on the Life of

8    Loan notes.  And let's go specifically to page 28 of that

9    document, Bates number 2632.  And we are in Exhibit 3.

10   A.  I'm there.

11   Q.  And on the 5th of January at 2:07:32 it reads that

12   the "death certificate and trust docs then she can assume

13   and do a loan modification and start a new loan mod."  Can

14   you tell me what that note means to you?  It's at 2:07:32.

15   A.  It would have to be read in conjunction with all of

16   the notes around the same time frame.  So we would start

17   with authorized phone call -- authorized call.  Phone

18   authorized third party.  Talked to Leo Hoover.  Verified

19   full payment inquiry as well as discussed the number of

20   facts for loan setup and trust docs, then they can assume

21   the loan.  So that would mean that there was a notification

22   of death; that they would have to send the death certificate

23   and trust documents and then go to the process of attempting

24   to assume the loan and start a new loan and also do a loan

25   modification.

1     Q.  Yeah.  But I'm talking about this notation

2  particularly.  It says, "Death cert and trust docs then she

3  can assume and do a loan mod to start a loan sys gen

4  comment."  Can you tell me what this is?

5          MR. MOORE:  Objection, asked and answered.

6     Q.  Well, is this an email?

7     A.  That is a communication that's done by phone.  If

8  you look at everything together, Mr. Hoover called in.  And

9  that information was provided and then he stated that he

10  would have to provide the death certificate trust docs.

11  Once that's provided, then they could attempt to assume the

12  loan and do a loan modification.

13     Q.  So this is notes from a phone call?

14     A.  Yes.

15     Q.  And have I been provided this phone call?

16     A.  I don't know.

17     Q.  Okay.  And it looks like there's a phone number

18  here.  That came from 253273 -- maybe that's not a phone

19  number.  I'm not sure.

20          MR. MOORE:  Where do you see that, Christina?

21          MS. HENRY:  1:48:52.

22     A.  Is it the 561 number?

23     Q.  No.  It's at the end, 253.  I don't know what the

24  561 number is.  Is that a phone number?  That's probably a

25  phone number at Ocwen, correct?

Page 47

1      A.  Which number, the 253 number?

2      Q.  Yeah.  I'm just trying to see if we can tell which

3   phone number this came from.  It says, 1/5/2019 at 1:48:52

4   at the end of that note.  It was what I thought was a phone

5   number but maybe it's not.  What would that number be?  What

6   would any of these numbers be?

7      A.  That appears to be a phone number, the 253.

8      Q.  Okay.  So does PHH retain voice mail communications?

9      A.  Voice mail, you said?

10     Q.  I'm sorry.  Phone call communications with

11  borrowers?

12         MR. MOORE:  Objection to form.

13     A.  If that call is captured.

14     Q.  Are all calls captured?

15     A.  I don't know if all calls are captured.

16     Q.  Some calls are captured, though, right?

17     A.  Yes.

18     Q.  So why are some calls captured and others not

19  captured?

20     A.  I don't know, as most calls are for quality and

21  training purposes.

22     Q.  So how long are phone calls or phone call recordings

23  retained?

24     A.  I couldn't say off the top of my head exactly the

25  time frame for retaining phone calls.

Page 48

1      Q.  You did review the retention records.  We went over

2   that the first thing before you testified today, correct?

3      A.  I did review the retention policy, yes.

4      Q.  So were you aware of the retention policies for

5   phone calls?

6      A.  The exact time frame in which it's kept, there's a

7   lot of different days for keeping data.  So without having

8   it in front of me, I couldn't say for certain a time.

9      Q.  Okay.  So you don't know?

10     A.  Not off the top of my head, no.

11     Q.  Okay.  So prior to this phone call, how was this

12  account notated as far as Mr. Suleiman being dead or alive?

13     A.  The account was notated as the borrower still being

14  alive.  There was no notification of him being deceased.

15     Q.  And they sent in a death certificate, didn't they?

16         MR. MOORE:  Objection to form.

17     A.  Yes, a death certificate was sent.

18     Q.  Okay.  I actually didn't see that communication

19  provided to me in the information that you provided.  I went

20  through it pretty thoroughly.  I didn't see any

21  documentation there showing what was sent in in January to

22  Ocwen.  And I'm going to go to January 11th because I

23  believe that's the day that it was sent in and I don't see

24  any documents.  Do you believe that you sent me those

25  documents?

1       A.  Are you asking me or --

2       Q.  Yes, I'm asking you.

3       A.  I don't know all the documents that were produced in

4   discovery.  A lot of documents were produced, so I couldn't

5   say what all the documents are.

6       Q.  So I'm going to have you look at a document that

7   I've provided here as number 5.

8           MS. HENRY:  I'm going to ask that that be Exhibit

9   Number 6.

10          (Exhibit 6 marked.)

11      Q.  I will tell you that this is a document that the

12  plaintiff produced in discovery.  I could not find this

13  document in the discovery produced by Ocwen.  So I'm going

14  to have you review this and tell me if you're familiar with

15  it.

16      A.  With this document, no.  Today was the first time I

17  saw this email from Ms. Hoover.

18      Q.  And do you have any information as to you -- you

19  testified earlier that you received the document in January

20  or that --

21      A.  No.

22      Q.  -- PHH received the death certificate in January.

23  Do you have any information as to what document to look at

24  to show that?

25          MR. MOORE:  Objection to form, asked and answered.

Page 50

1      A.  It would be the Life of Loan notes.

2      Q.  But the actual certificate of death, you don't have

3  that?

4      A.  Again, this -- as far as Exhibit 5 that's the first

5  time I've seen it.  There's notation that, again, in Life of

6  Loan the death certificate was received.

7      Q.  Okay.  So go ahead and look at this email.

8      A.  (Witness reviews document.)  I've reviewed the

9  email.

10     Q.  This is what was provided to Ocwen on January 11th,

11 2019?

12     A.  I don't know as this -- again, this is the first

13 time I've seen this particular email.

14     Q.  And is there a reason that -- have you provided all

15 emails that were sent to Ocwen by Ms. Hoover and that were

16 sent from Ocwen or PHH to Ms. Hoover?

17         MR. MOORE:  Objection to form.

18     A.  I don't know if we provided every single instance of

19 email contact between Ocwen, PHH, and Ms. Hoover.

20     Q.  So for this email, can you verify why I have not

21 received this email in discovery?

22         MR. MOORE:  Objection to form, asked and answered.

23     A.  I don't know.

24     Q.  Have you checked emails that were sent by Ms. Hoover

25 to sii@Ocwen.com?

Page 51

1     A.  No.

2     Q.  And why not?

3     A.  As that's not an email inbox that I would have

4  access to.

5     Q.  And what email inboxes would you have access to?

6     A.  My email, any documents sent to me by anyone within

7  or outside the organization.

8     Q.  So sii@ocwen.com, do you know what that email stands

9  for?

10    A.  Do I know what what stands for exactly?

11    Q.  Well, you see where it says it was sent to

12  sii@ocwen.com?

13    A.  Yes.

14    Q.  Are you familiar with that email?

15        MR. MOORE:  Objection, asked and answered.

16        MS. HENRY:  I'm sorry.  I don't know that he's

17  answered that.  I didn't ask him whether he's looked at the

18  email.  I just want to know if he's familiar with the email

19  address.

20        MR. MOORE:  Oh, email address.  That's a different

21  question.

22        MS. HENRY:  Sorry.  The email address if I wasn't

23  clear.

24    A.  It was an email address that was utilized by Ocwen

25  for submitting documents when a borrower had passed away;

Page 52

1  the relevant trust; if there is an executor to the estate

2  probate, death certificate, and so forth.

3      Q.  And are emails scanned into a system and linked to

4  an account?

5      A.  In general or for this account?

6      Q.  For this account.

7      A.  If documents were received from a homeowner, they

8  are scanned to the specific account.

9      Q.  So is there a reason that this email and these

10  documents were not scanned and linked to this account?

11          MR. MOORE:  Objection to form, asked and answered.

12      A.  I don't know that -- the documents themselves

13  weren't a part of the account that was scanned.  As I said,

14  I haven't seen it before but I don't know that it isn't part

15  of an imaging file.

16      Q.  And if it was in an imaging file, where would that

17  imaging file be?

18      A.  In Idesk.

19      Q.  In Idesk.  So do I have all documents associated

20  with this account from Idesk?

21      A.  If you're asking for all of the documents that are

22  imaged for this account, I don't know if you have every

23  single document related to this account.

24          MR. MOORE:  I'll represent we produced the entire

25  imaging file other than the confidential documents that

1   we're still discussing.

2           MS. HENRY:  Okay.

3           MR. MOORE:  Let's expedite this.

4       Q.  So is there a reason to -- so absent this email, do

5   you have any proof that you received the death certificate,

6   the trust, or any detailed information?

7       A.  The Life of Loan notes states that the death

8   certificate was received.

9       Q.  And do you know what the death certificate says?

10      A.  Right now or at that time?

11      Q.  In January of 2019.

12          MR. MOORE:  Objection to form.

13      A.  The appropriate department that reviewed it

14  determined that it was an accurate death certificate and it

15  was notated in the loan to the Life of Loan notes.

16      Q.  So then let's go to 2630, page 26 of 84 of Exhibit

17  3.  And let's look at the notations on 1/17/2019.  Amir

18  Suleiman and Sarah Hoover were added to the account as

19  trustees, correct?

20      A.  That is what it states, yes.

21      Q.  And what does that mean as far as Ocwen and PHH

22  servicing is concerned?

23      A.  That the borrower was deceased.  Those documents

24  were received that shows that Sarah and her brother were

25  appointed as trustees for the trust document and were

Page 54

1    authorized on the account.

2        Q.  And that's authorized for all actions on the

3    account, correct?

4            MR. MOORE:  Objection to form.

5        A.  Authorized to access the account but not all actions

6    to the account as they weren't confirmed

7    successor-in-interest on the account or assumed the loan at

8    the time.

9        Q.  But they are able to call in, correct?

10       A.  Yes.

11       Q.  And get information on the account, correct?

12           MR. MOORE:  Objection to form.

13       A.  They are able to call in and discuss the account.

14       Q.  Okay.  So now I'm -- so now I'm going to -- so was

15   anything else changed when they were appointed as trustees

16   on the account?

17       A.  They were appointed, as I said, as authorized on the

18   account and the account was notated that the borrower was

19   deceased.

20       Q.  Were any other authorizations changed on the

21   account?

22       A.  I would have to see the servicing notes.

23       Q.  Okay.  So I'm going back to your Exhibit 4 and your

24   answer to interrogatory -- I think it's two.  You've just

25   testified that Ocwen learned about the death in January of

Page 55

1  2019.  Can you tell me why you have answered it here that

2  PHH learned Mr. Suleiman was deceased in August 2019?

3      A.  As I was answering it at that time, I was answering

4  on behalf of PHH.  But in looking at the definitions, I have

5  seen one of a direct answer as to Ocwen.

6      Q.  No.  I'm actually at the moment I'm taking you at

7  face value.  Why did PHH only learn about it in August 2019,

8  the new entity PHH?

9      A.  As for PHH, that's when documents were submitted by

10 Ms. Hoover regarding the death of the borrower.

11     Q.  Okay.  So did PHH not know about it when it was

12 transferred to them in June -- well, when it was transferred

13 over in June of 2019?

14     A.  Would you repeat the question?

15     Q.  What information was transferred from the platform

16 that Ocwen used to the platform that the new PHH uses in

17 June of 2019 for this loan?

18     A.  It would be all the information relating to the

19 loan.

20     Q.  Which would include what?

21     A.  It would include payment histories, documents

22 related to the loan, comment logs.  All of the relevant

23 documents would be converted to the new system.

24     Q.  So would it have included the death certificate?

25     A.  That would have been part of the imaging file.

Page 56

1    Q.  But you just testified that I have the whole imaging

2    file and it wasn't in there; is that right?

3         MR. MOORE:  Objection to form.  That wasn't his

4    testimony.

5    A.  You do have our imaging file.  Again, you do have

6    the entire imaging file.  As I said, that's when Ocwen first

7    learned in January.  And in August PHH received documents

8    relating to the death of Mr. Suleiman.

9    Q.  So were those documents received in January 2019

10   transferred to PHH in June of 2019?

11   A.  I would have to review all of the documents in the

12   imaging file.

13   Q.  So was the death certificate that was received in

14   January of 2019 and the trust documents that assigned Ali

15   Suleiman and Amir Suleiman as trustees on the account in

16   January 2019 as notated on the Life of Loan history, were

17   those documents transferred to PHH in June of 2019?

18   A.  Again, I would have to see the entire imaging file

19   to say exactly.  If it's part of the imaging file, it would

20   be there.

21   Q.  Okay.  So if they are not there, did PHH know about

22   his death on January of 2019 -- I mean June -- at the time

23   of the transfer, in June 2019?

24        MR. MOORE:  Christina, we're happy to supplement

25   this interrogatory.

Page 57

1        MS. HENRY:  I just want to know because he has
2    stated in his --
3        MR. MOORE:  Because that's a definitional issue and
4    we're happy to supplement.
5        MS. HENRY:  I'm sorry.  It's not, actually.  He's
6    testified that PHH did not learn about his death until
7    August of 2019.  I want to know if on the time they
8    transferred, whether or not they knew he was dead.
9    A.  Without seeing the entire imaging file before me, I
10   couldn't say.
11   Q.  Okay.  Well, you testified at the time of your
12   interrogatories that they did not know; is that correct?
13   A.  That is my testimony.
14   Q.  Okay.  So what happened in August of 2019 that let
15   them know that he was deceased?
16   A.  As I stated before, Ms. Hoover submitted several
17   documents including the death certificate.
18   Q.  Okay.  But they had been communicating with Ms.
19   Suleiman prior to August 2019, right?
20       MR. MOORE:  You mean Ms. Hoover?
21       MS. HENRY:  What did I say?
22   Q.  Ms. Hoover, prior to August 2019, correct?
23   A.  Yes, there was communication.
24   Q.  Okay.  So I'm going to have you look at Exhibit 7.
25       MS. HENRY:  Number 7 is now going to be Exhibit 7.

Page 58

1          (Exhibit 7 marked.)

2      Q.  All right.  Take a look at Exhibit 7.

3      A.  Yes.

4      Q.  Open it up and let me know if you've reviewed this

5  document.

6      A.  I have reviewed this document.

7      Q.  And what is this document?

8      A.  It is the goodbye letter from Ocwen, letting them

9  know that PHH is going to become the servicer.

10     Q.  And this is what is sent out to borrowers when it

11  transfers from Ocwen to PHH?

12     A.  It's what is sent out when there's a servicing

13  transfer, yes.

14     Q.  Okay.  So even though they were merged together, it

15  was considered a servicing transfer?

16     A.  Yes.

17     Q.  And who is the relationship manager representative

18  on this letter?

19     A.  Shelly Robertson.

20     Q.  Who does Shelly Robertson work for?

21     A.  PHH.

22     Q.  And at the time did she work for Ocwen?

23         MR. MOORE:  Objection to form.

24     A.  I don't know.

25     Q.  Okay.  Well, she could have worked for only PHH

1    going forward.  I'm not sure.  I'm actually asking.  So is

2    it your testimony that Shelly Robertson works for PHH now?

3        A.  Yes.

4        Q.  So can you tell me who the Mortgage Family is?

5        A.  Mortgage Family is the email address that PHH

6    utilizes.

7        Q.  But even though it says Mortgage Family on email

8    information going to Shelly Robertson, that is still an

9    Ocwen email?

10       A.  A PHH email, yes.

11       Q.  Or PHH email, okay.  Well, we'll see those emails in

12   a minute.  So I'm going to note you to the first page of

13   this document.  Who is this letter -- this welcome or

14   handoff -- I guess it's a goodbye letter, right?

15       A.  Yes.

16       Q.  Who was this goodbye letter mailed to?

17       A.  The Estate of Ali Suleiman.

18       Q.  Okay.  So in May of 2019 Ocwen Loan Servicing still

19   knew that Ali Suleiman was dead, correct?

20       A.  That he was deceased, yes.

21       Q.  Okay.

22       A.  Now, we'll look at Number 8, that PHH notice

23   regarding new servicing.

24           (Exhibit 8 marked.)

25       A.  Yes.  I'm reviewing that (Witness reviews document.)

Page 60

1     Q.  Okay.  Have you reviewed it?

2     A.  Yes.

3         MR. MOORE:  I just want to put on the record for a

4  second, can we have -- from either Christina -- at the

5  conclusion of this deposition the reworked exhibit numbers.

6  I just want to make sure me and my witness can review that.

7         MS. HENRY:  Yes.  I'm changing them as we go, so I

8  can do that.

9     Q.  Okay.  So Exhibit 8, Mr. Prudent, I could not figure

10 out -- I could not tell who this was mailed to.  Was this

11 mailed out to the borrowers?

12        MR. MOORE:  Objection to form.

13    A.  It doesn't appear that this was mailed out.

14    Q.  So who would have received this letter?

15    A.  I don't know as there isn't -- it isn't addressed to

16 anyone.  It seems to just say "Dear customer."

17    Q.  Well, I found it in the documents that you provided.

18 I also couldn't tell whether this was mailed out.  And so I

19 guess I'm asking if it's not mailed out to customers, what's

20 its purpose?

21        MR. MOORE:  Objection to form.

22    A.  In providing information to the customers to their

23 new account at PHH.

24    Q.  So can you take a look at this document again during

25 lunch and let me know whether or not this was mailed to the

1  Estate of Mr. Suleiman or to some other borrower or not?  Is

2  that something you can look into?

3      A.  Yes.

4      Q.  Okay.  That would be helpful.  I might have -- I

5  might have missed -- there might have been a document in

6  there that shows it was mailed, like on the page before or

7  page after, but I didn't see it.

8          Okay.  So communications between Ms. Hoover and

9  Ocwen or PHH, they often happened via email, correct?

10     A.  Communications can be via email or a phone call or

11  correspondence.

12     Q.  And there also was a portal where borrowers upload

13  documents, correct?

14     A.  Yes.

15     Q.  And what is that portal called?

16     A.  I would have to think.  I don't know if the name has

17  changed since that time.  There is a portal.  I will have to

18  check.

19     Q.  So did Ms. Hoover upload documents regarding this

20  account to that portal?

21         MR. MOORE:  Objection to form.

22     A.  Ms. Hoover did provide documents to Ocwen/PHH.

23     Q.  Right, but how did she provide them?

24         MR. MOORE:  Objection to form.  Is there a specific

25  time period you're asking about?

1        MS. HENRY:  I think at the moment let's talk about

2    the time period prior to the transfer, so from January 2019

3    to June 1st, 2019.

4        A.  Ms. Hoover sent documents to Ocwen via email.

5        Q.  And do you have any documents that she uploaded to a

6    server or a portal?

7        A.  If the documents were uploaded, they would be imaged

8    and be part of the imaging file that was produced.

9        Q.  Okay.  So to the best of your knowledge, you have

10   everything, correct?

11       A.  Correct.

12       Q.  I'm going to point you to document 9, 10, 11, and

13   12.

14       MS. HENRY:  Can we put those together as one

15   document?  I think it probably makes more sense.

16       MR. MOORE:  Would it be possible to have those sent

17   as one document?

18       MS. HENRY:  Yeah.  I can do that now.

19       MR. MOORE:  Okay.

20       MS. HENRY:  I'm just realizing it makes a lot more

21   sense than having four different documents.

22       MR. MOORE:  You want to take a five minute break

23   just to do that?

24       MS. HENRY:  No.  I'm doing it just as we speak here.

25       MR. MOORE:  Sony, do you need a break or are you

Page 63

1    good?

2            THE WITNESS:  Yeah, I need a quick bathroom break.

3            MS. HENRY:  Okay.

4            (Brief recess.)

5            (Exhibit 9 marked.)

6        Q.  Before we go there, I'm going to go back to Exhibit

7    3, which is Life of Loan history, and have you look at page

8    12.  On 6/13 it says, "Completed prior to Ocwen boarding."

9    Can you tell me what that means?

10       A.  One moment as I get there.  You said page 6?

11           MR. MOORE:  Yeah, one moment.

12           MS. HENRY:  Page 12 of 84 of the Life of Loan

13   history, Exhibit 3.

14           MR. MOORE:  And what date?

15           MS. HENRY:  6/13/2019.

16       A.  I don't know what that comment means.

17       Q.  Okay.  But by then the boarding process is

18   completed?

19       A.  Yes, as it boards in the PHH system.

20       Q.  So you don't know what "delrev" means?

21       A.  No.

22       Q.  Does that column refer to a person or does it refer

23   to an event?

24           MR. MOORE:  Objection to form.  You mean the delrev

25   column?

1       MS. HENRY:  Yeah, the delrev column of the Life of

2   Loan history.

3       A.  It relates to the task ID for the task being

4   completed.

5       Q.  So that's a task ID.  Do you have the codes for the

6   various task IDs in this Life of Loan Memo?

7       A.  No.

8       Q.  And was that requested in discovery?

9       MR. MOORE:  Objection to form.  If you want to show

10  him the discovery request, go ahead.

11      MS. HENRY:  I mean I can go back to it.  I just want

12  to know if he knows off the top of his head.

13      A.  Off the top of my head, no, I don't know.

14      Q.  Well, I will tell you that if you go back to Exhibit

15  4, it was requested.  And so I'm questioning why it wasn't

16  produced.  Is there anything that you have that could tell

17  us what these various task IDs and comment codes refer to?

18      A.  Not with me right now, no.

19      Q.  But is there such a document?

20      A.  There could be a code breaker.

21      Q.  A code breaker, that's what you call it?

22      A.  Yes, to break -- for the various different codes

23  that are used.

24      Q.  Have you ever reviewed it before?

25      A.  Not for the new servicing platform.  I'm not

Page 65

1    familiar with all the codes, no.

2       Q.  So you're testifying today you're not familiar with

3    all the codes of the task IDs; is that right?

4          MR. MOORE:  Objection to form.

5       A.  I am not familiar with all of the codes, no.

6       Q.  And then two lines below it on 6/5/2019 at 12:50:29,

7    loan modification added from 2011.  So that's the prior loan

8    mod?

9       A.  Yes.

10      Q.  From Mr. Suleiman?

11      A.  Yes, that was the prior loan modification.

12      Q.  And that mod was completed, right?

13      A.  Yes.

14      Q.  So now I'm going to have you look at Exhibit 9.

15      A.  I'm reviewing Exhibit 9.

16      Q.  Go ahead and review those documents and let me know

17   if you're familiar with them.

18      A.  (Witness reviews documents.)  These are documents

19   that are part of the loan file.

20      Q.  Okay.  Tell me when you're ready to discuss them.

21      A.  I'm ready.

22      Q.  Okay.  The first document, the first page of Exhibit

23   9 with 1105 as the Bates number at the bottom.  This appears

24   to be an email from Shelly Robertson to Kaylyn Hunt.  Do you

25   know who Kaylyn Hunt is?

1        A.   No.

2        Q.   And it's from MBS to OCW.  Can you tell me what

3    those two acronyms are for?

4        A.   Those are the two mailboxes depending on if you are

5    at PHH or if you have an Ocwen email address.

6        Q.   An Ocwen email address or a Mortgage Family email

7    address?

8        A.   Yes.

9        Q.   So you testified before that Mortgage Family is the

10   same as Ocwen; is that right?

11       MR. MOORE:  That wasn't his testimony.

12       Q.   What is your testimony as to what is Mortgage

13   Family?

14       A.   Mortgage Family is the domain name used for email

15   addresses for PHH.

16       Q.   But it's not a separate entity?

17       MR. MOORE:  Objection to form.

18       A.   No.

19       Q.   Okay.  So can you tell me what the nature of this

20   email is?

21       A.   It appears in reference to an insurance quote from

22   State Farm.

23       Q.   But this is asking for approval from Kaylyn Hunt,

24   isn't it?

25       A.   It says, "Please reply with approve or reject.  Upon

Page 67

1   receipt of approval, email will be sent.  If you reject,

2   please include reasons for the rejection.  The email agent

3   will revise and resend for approval."

4       Q.  Okay.  And so this is not the actual email that went

5   out to the borrower, right?

6       A.  I don't see that the borrower is listed on this

7   email chain.

8       Q.  Okay.  And then we go to the next page, and this

9   email is 1106.  And this is an email from Sarah Hoover,

10  correct?

11      A.  It appears to be from Sarah Hoover, yes.

12          MR. MOORE:  Sorry to interrupt.  I just want to

13  clarify the record for the court reporter that Christina

14  when you're referring to the Bates numbers for this exhibit,

15  you're referring to the number but you're failing to mention

16  -- and I just want to put it on the record -- these were

17  produced by the defendant.  So it's Defendants Bates range

18  1105 and various numbers.  I just wanted to put that on.

19          MS. HENRY:  Okay.  Thanks for the clarification.

20          MR. MOORE:  Yep.

21      Q.  So this is an email to Ms. Robertson on June 21st to

22  Shelly Robertson.  And then it appears that Shelly Robertson

23  is passing it on; is that right?

24      A.  It shows that she sent it to a relationship manager

25  at mortgagefamily.com.

1      Q.  Well, I thought she was a relationship manager?

2      A.  She is the assigned relationship manager.

3      Q.  Okay.  So I also note here that this email is signed

4   to the Estate of Ali Suleiman.  Do you see that?

5          MR. MOORE:  Objection to form.  It's signed Sarah

6   Hoover.

7      Q.  Well, it references the Estate of Ali Suleiman in

8   the email, doesn't it?

9          MR. MOORE:  You stated it was signed.  It's not

10  signed.

11         MS. HENRY:  Understood.  Strike it.  I'm asking

12  again.

13     Q.  So this email from Ms. Hoover references the Estate

14  of Ali Suleiman, doesn't it?

15     A.  In the email there is the Estate of Ali Suleiman.

16     Q.  That is June of 2019, right?

17     A.  That is the date listed in the email, yes.

18     Q.  And at this point PHH is the contact that she's

19  emailing, right?

20     A.  Yes, PHH is the servicer.

21     Q.  So does she have authorization on the account at

22  this time?

23         MR. MOORE:  Objection to form.

24     A.  She is authorized at this time.

25     Q.  And what is the basis of her authorization?

Page 69

1     A.  It would have been with the information transfer
2  from Ocwen.
3     Q.  And so when PHH is looking at the account, how do
4  they know that she's authorized?
5          MR. MOORE:  Objection to form.  To the extent we're
6  using the word "authorized," do you mean authorized third
7  party?  What do you mean, Christina?
8          MS. HENRY:  I think I mean authorized third party.
9  I'm actually going by, I think how it's listed in this loan
10  history.  Yes.
11          MR. MOORE:  Okay.  I just wanted to specify because
12  it's important.
13     Q.  So was she an authorized third party when PHH was
14  communicating with her in June of 2019?
15     A.  There were communications between her and PHH during
16  that time and it would have been as an authorized third
17  party.
18     Q.  So how would they know she's an authorized third
19  party?  What are they looking at on the screen that would
20  let them know that she's an authorized third party?
21     A.  There would be various contact screens for different
22  departments to verify the account and review the
23  information.
24     Q.  Okay.  And those screens look different than this
25  MSP Life of Loan Memo?

1       A.  The Life of Loan Memo is only a summary of all the

2   interaction as far as contact with the borrower; not all of

3   the different screens in MSP.

4       Q.  Okay.  So I'm looking at Defendants Bates number

5   2615, page 11 of 84.  And I'm going to the notation on

6   6/18/2019 and then above it on 6/19/2019.  So can I have you

7   read those two notes?

8           MR. MOORE:  Are you there?

9       A.  Not yet.  What is the time stamp?

10      Q.  6/18/2019 at 2:26:50 and the next day at 6:14:42

11  p.m.?

12      A.  6/18/2019 states, "Note validation complete.  Note

13  review completed in real servicing prior to boarding.  See

14  note val task notes."

15      Q.  Okay.  So what does that mean to you?

16      A.  Reviewing of the -- again, Life of Loan notes and to

17  see the specific task notes related to that.

18      Q.  And then the entry right above it.  On 6/19/2019,

19  what does that information tell you?  And I guess it goes

20  one more up.  Yeah, there's two.

21          MR. MOORE:  Yeah, there are two entries.

22      Q.  Two entries there.

23      A.  There are two entries; the first one I don't know

24  what that means; the second one, borrower is deceased.  And

25  it states no.

1      Q.  So in June of 2019, that's the foreclosure
2  department at PHH, is not aware that the borrower is
3  deceased; is that right?
4          MR. MOORE:  Objection to form.
5      A.  The notation says, "Borrower deceased?"  And it
6  states "No."
7      Q.  And who is making that notation?
8      A.  It would be an associate in the department.
9      Q.  In the foreclosure department, right?
10     A.  It was a foreclosure based task note, yes.
11     Q.  Okay.  So the prior task notes from January 2019
12 that we looked at earlier were customer service and
13 collection task notes, right?
14     A.  They were from collection and customer service in
15 January 2019.
16     Q.  So would the foreclosure group have access to those
17 customer service and collection notes?
18     A.  It depends on what access they have in MSP.
19     Q.  So do you know what access they have in MSP?
20     A.  No.
21     Q.  And why not?
22         MR. MOORE:  Objection.
23     A.  I don't know the access that every single associate
24 at PHH or Ocwen has to MSP.
25     Q.  Well, I'm not asking for every single associate.

1   I'm asking for the foreclosure associates that dealt with

2   this loan.

3           MR. MOORE:  Objection, asked and answered,

4   badgering.

5       A.  Again, as I stated, I don't know.  Every group has

6   different access.  I'm not familiar with the access setup

7   for different groups.

8       Q.  And you didn't talk to the foreclosure group that

9   dealt with this loan, correct?

10          MR. MOORE:  Objection, asked and answered.

11      A.  As I stated before, I did not speak with anyone, no.

12      Q.  So then on 6/20/2019 Sarah Hoover was verified and

13  provided a loss mitigation email to send in loan documents,

14  right?

15      A.  It does say that authorized third party Sarah Hoover

16  was verified and provided an email address to send loss

17  mitigation documents.

18      Q.  So that was the collection department?

19      A.  Yes.

20      Q.  So is it possible that the collection department is

21  aware of her authorization due to the trust but the

22  foreclosure department is not?

23      A.  I don't know.

24      Q.  Okay.  And then on 6/26 it says that Sarah Hoover --

25  "Received A3P Sarah Hoover."  Authorized third party, is

Page 73

1    that what "A3P" stands for?

2         A.  Yes.

3         Q.  "Is working on a family transfer and loan mod."

4    Would you work on a family transfer if the person was alive?

5              MR. MOORE:  Objection to form.

6         A.  Well, a family transfer is saying that the person

7    wants to assume the loan and then modify the loan once they

8    assumed liability for the loan.

9         Q.  So can you have a family transfer when someone is

10   alive?

11        A.  You can if someone decides to release their

12   obligation and a family decides to assume the loan.

13        Q.  So is that what could be happening here?

14             MR. MOORE:  Objection to form, speculative.

15        A.  Here she's working on having a transfer of the loan.

16   My understanding is an assumption and to modify the loan.

17        Q.  Right.  But your earlier testimony is that PHH was

18   not aware of Mr. Suleiman's death.  So is this family

19   transfer meant to transfer the loan and do a loan mod while

20   Mr. Suleiman was alive, or so they thought?

21             MR. MOORE:  Objection.  His testimony was that Ocwen

22   knew in January.

23             MS. HENRY:  Yeah, but his testimony is that PHH

24   after it was boarded the loan, did not.

25        Q.  Is that correct, Mr. Prudent?

1      A.  As I stated, with documents received in August 2019

2  is when PHH first understood that the borrower was deceased.

3      Q.  So at the time in June of 2019 discussions with Ms.

4  Hoover were with the assumption that she was an authorized

5  third party but that Mr. Suleiman was alive, correct?

6      A.  I didn't say Mr. Suleiman was alive.  I said a

7  family transfer can be done if someone is alive or deceased.

8      Q.  Okay.  Fair enough.  So let me back up.  So

9  communications with Ms. Hoover prior to August, from June

10 1st until August, were done with the assumption that Mr.

11 Suleiman was alive when you're talking to PHH, correct?

12         MR. MOORE:  Objection to form.

13     A.  I don't know what the assumption was.  It's

14 working -- again, working on a family transfer package and

15 attempting to modify the loan.  That is what the comment

16 says.

17     Q.  Okay.  So let's go to the rest of the notes from

18 Exhibit 9.

19     A.  And that is the emails and everything else, correct?

20     Q.  Correct.  So the third page of that exhibit in

21 Exhibit 9 is a fax dated July 8th, 2019.

22     A.  Yes.

23     Q.  Do you see that fax?

24     A.  I do.

25     Q.  And who was it sent to?

1      A.   Shelly Robertson.

2      Q.   And it also says here that it was sent to the

3   account for the Estate of Ali Suleiman, correct?

4      A.   Yes.

5      Q.   And now looking at that on July 8th, can you find

6   that notation in the Life of Loan history?

7      A.   One moment.

8      Q.   When that fax was received.

9      A.   On July 9 it says, "Non-loss mit related documents

10  imaged."

11     Q.   Okay.  And at that time was the account noted as the

12  borrower being deceased?

13     A.   I don't see anything in the Life of Loan notes that

14  states that.

15     Q.   Okay.

16          MR. MOORE:  And I'll just note for the record that

17  the version that counsel is relying on of this part of

18  Exhibit 9 is not the complete document.  It's a two-page fax

19  and this is just the cover.

20          MS. HENRY:  It's just the cover page, correct.

21     Q.   And but at this point Shelly Robertson had

22  authorization to speak to Sarah Hoover, correct?

23     A.   Shelly Robertson was the relationship manager, so

24  she would have communicated with Ms. Hoover whether through

25  email or whatever form of communication Ms. Hoover contacted

Page 76

1    her on.

2         Q.  And she had authorization to speak to her?

3         A.  The note states authorized third party.

4         Q.  Okay.  And the next document on August 2nd, 2019.

5         A.  I'm at that document.

6         Q.  Okay.  And this document is now addressed to the

7    Estate of Ali Suleiman, correct?

8         A.  Correct.

9         Q.  So by this date PHH is aware that Mr. Suleiman is

10   deceased, correct?

11        A.  It states the Estate of Ali Suleiman.

12        Q.  Right.  And that would imply that he's deceased,

13   right?

14        A.  That would imply that he is deceased.

15        Q.  Yes.  I think we're saying the same thing, right?

16        A.  Yes.

17        Q.  Okay.  And then this is from Shelly Robertson,

18   correct, to the customer?  And who is the customer at this

19   time?

20        MR. MOORE:  Objection to form.

21        A.  As the letter is addressed to the Estate of Ali

22   Suleiman.

23        Q.  Okay.  And it says that the application is

24   incomplete.  What application are they referring to?

25        A.  The application is incomplete and referring to a

Page 77

1    loss mit application.

2        Q.  And is that the loss mit application that was faxed

3    on July 8th?

4        A.  It was part of documents that were received for a

5    loss mitigation -- excuse me -- that were received for a

6    loss mitigation.

7        Q.  Okay.  So by August 2nd we would agree that PHH and

8    Shelly Robertson, in particular, knew that Mr. Suleiman was

9    deceased, right?

10       A.  As the letter states, it is to his estate.  I can't

11   speak as to what Ms. Robertson would know.

12       Q.  Okay.  And I also note that this letter was sent by

13   NewRez.  Do you see that?

14       A.  Yes.

15       Q.  And who is NewRez?

16       A.  NewRez is the master servicer.

17       Q.  And why is the master servicer sending this letter?

18       A.  It was decided that NewRez, as the master servicer,

19   would put their name out there more as Ocwen and Ocwen or

20   PHH would continue to service the loan.

21       Q.  And was there a welcome letter for borrowers to know

22   who NewRez is?

23       A.  I believe I saw some letter that mentioned that.

24       Q.  Okay.  And now there's no reference to PHH anymore

25   in this letter, right?

Page 78

1        MR. MOORE:  Objection.

2        A.  The letter does not include any information about

3    PHH on it.

4        Q.  And then the 8/13 letter, the next one, this is also

5    a communication from Shelly Robertson to the Estate of Ali

6    Suleiman?

7        A.  That is correct.

8        Q.  Okay.  So then I would like to have you tell me in

9    the notes where it actually is notated that the death

10   certificate is received and acknowledged by PHH in August of

11   2019, which is what you testified to in your

12   interrogatories?

13       MR. MOORE:  Objection to form.  He didn't testify

14   that the death certificate was received in August.

15       Q.  So, Mr. Prudent, can I get you to explain to me?

16   I'm going to go have you look at the Life of Loan history,

17   pages 10 of 84, 11 of 84.  I believe those are the two

18   pages, perhaps 9 of 84.  So 9, 10, and 11 of the Life of

19   Loan history.  That's Defendants Bates Numbers 2613 through

20   2615.  Can you review those notes and tell me when it was

21   that PHH learned that Mr. Suleiman was deceased?

22       A.  Give me a moment as I review those pages of the Life

23   of Loan.

24       MR. MOORE:  I'll just state for the record it was

25   also on page 8, August.  It goes to page 8, not just 9 and

1   10.

2          MS. HENRY:  Okay.  Through 8 through 10.

3          MR. MOORE:  Would now be a good time for a five

4   minute break while he reviews?

5          MS. HENRY:  I would prefer to just stay on the

6   record.  I don't think it will take him that long, will it?

7          MR. MOORE:  Okay.

8      A.  On Defendants 2613 at August 28, 2019 the note

9   states, "If you want to confirm successor-in-interest and

10  update deceased details on the account send us the document

11  to the specific email address provided with documents.  Also

12  third party authorization does not fall under

13  successor-in-interest purview."

14     Q.  So you're telling me that that's -- so tell me what

15  that means to you.

16     A.  That means that the account is -- there are still

17  documents that are needed to update the account for

18  successor-in-interest and update the deceased details on the

19  account and where to send all the proper documents to PHH

20  and that the third party authorization doesn't fall under

21  the successor-in-interest purview category on the account.

22     Q.  Okay.  But I thought we were just looking for the

23  death certificate or awareness that he was deceased?

24         MR. MOORE:  Objection.  He's testified to that.

25         MS. HENRY:  He hasn't testified to the date.  He

Page 80

1    testified earlier, when we looked at the interrogatories,

2    that it was in August of 2019 but he didn't know the exact

3    date.  And he said he knew this by looking at the Life of

4    Loan history, which is what we are looking at now.  So now

5    that he's looking at it, I'm trying to understand where

6    Interrogatory 2, his answer to Interrogatory 2 refers to

7    which date in August.

8         MR. MOORE:  I don't believe his testimony was

9    limited to just to one entry in the Life of Loan as opposed

10   to everything we produced in this case.

11        MS. HENRY:  He says in August 2019.

12        MR. MOORE:  I understand that.

13   A.   I provided you the comment.  It was August 28, 2019.

14   Q.   So August 28, 2019?

15   A.   Is when all of the information is being produced for

16   confirmation of successor-in-interest with all the documents

17   being reviewed.

18   Q.   So it wasn't until August 28, 2019 that they learned

19   Mr. Suleiman was deceased.  And so a borrower being deceased

20   is different than a borrower's authorization -- I mean

21   what's the difference?  I'm confused.

22   A.   I'm confused by your question; if you could restate

23   it, please.

24   Q.   So what happens when PHH finds out that a borrower

25   is deceased?

1      A.  Once there's a discovery that a borrower is

2   deceased, an heir, anyone related to borrower or a third

3   party, would provide the death certificate and the relevant

4   documents for heirs, the account would be updated and the

5   person could be added as an authorized third party but not

6   successor-in-interest until all of the relevant documents

7   are sent and reviewed and it goes through quality control

8   and then successor-in-interest is confirmed.  And also

9   homeowner -- not homeowners, but third parties -- they can

10  also assume the loan where they take liability for the loan

11  as well.

12      Q.  So it says, "The document ID of Idesk.  Also third

13  party authorization does not fall under SII purview."  What

14  are they referring to here?

15      A.  The authorization of the third party doesn't fall

16  under the category of a successor-in-interest.

17      Q.  But the authorization of a third party was already

18  noted on the account in January of 2019, right?  So was that

19  taken off?

20      A.  It doesn't state that.  It says, the authorized

21  third party authorization doesn't fall under the category of

22  successor-in-interest.

23      Q.  So that's my question.  When I asked before, the

24  communications with Shelly Robertson and Sarah Hoover in

25  June and in August in the letters that we reviewed in

Page 82

1    Exhibit 9, were under what authorization?

2        A.  As an authorized third party.

3        Q.  Which is an oral authorization or is it the

4    authorization when they were named as trustees from January

5    2019?

6        A.  It would have been from the information that was

7    converted from the Ocwen system to the PHH system as they

8    were authorized that way.

9        Q.  So it's true, then, that the email or the

10   information that I provided to you in -- sorry.  Just a

11   second -- strike that.

12       So PHH doesn't have the authorization documents

13   correct?

14       MR. MOORE:  Objection to form.  What do you mean by

15   "authorization documents"?

16       Q.  Whatever was authorized that created the notes on

17   Defendants Bates Number 2630 of Exhibit 3 that referenced

18   the death certificate and the parties as trustees on the

19   account, that information was not transferred to PHH; is

20   that correct?

21       A.  I don't know.  I haven't seen that information.

22       Q.  So I supplied you with those documents as part of

23   the exhibits today.  Is there a reason to think that those

24   documents are not correct?

25       MR. MOORE:  Objection to form, beyond the scope of

Page 83

1    the 30(b)(6) witness.

2        A.  They are the documents.

3        Q.  Well, I'm not trying to confuse you.  So when I'm

4    talking about this, I'm talking about the email that was

5    sent on January 11th, 2019, Exhibit 6, email to Ocwen?

6            MR. MOORE:  Objection, asked and answered.

7        Q.  How is it that they're listed as a trustee and now

8    there's no information of them as trustees in August?  Can

9    you explain that?

10       A.  No, I can't.

11           MS. HENRY:  So now I want to go to the fax, which is

12   Number 14, which will now be Exhibit 10.

13           (Exhibit 10 marked.)

14       Q.  Have you seen this document?

15       A.  Yes.

16       Q.  Can you explain what this document is?

17       A.  It is the fax from Elite Legal Network that was sent

18   to PHH.

19       Q.  And was this document received by PHH?

20       A.  Yes.

21       Q.  And this document contains a notice of bankruptcy

22   filing for Sarah Hoover, right?

23       A.  It does.

24       Q.  And was the bankruptcy noted in the account file?

25           MR. MOORE:  Objection to form.

Page 84

1    A.  Ms. Hoover did contact Ocwen and state that she was

2  filing bankruptcy -- PHH -- my fault.  Excuse me.

3    Q.  Well, Ocwen and PHH at this point they're the same

4  entity.  You work for Ocwen, right?

5    A.  Ocwen Financial.

6    Q.  Okay.  So this document was received from Elite

7  Legal on 9/9/2019.  Was it reviewed that day?

8        MR. MOORE:  Objection to form.

9    A.  I would have to look at the Life of Loan notes.

10    Q.  Okay.  Let's look at the Life of Loan notes.  I'm on

11  page 7 of 84, Exhibit 3.  And I'm looking at the date of

12  September 9th.

13        MR. MOORE:  I just want to back up for a second.  If

14  you look at the fax, it says 9/23/19 at the top.  I don't

15  think there's any testimony by my witness that it was

16  received 9/9/19.

17        MS. HENRY:  I think we're looking at a different

18  document, then.

19        MR. MOORE:  What does it say at the top?  I'm sorry.

20  It looks like --

21        MS. HENRY:  It says 9/9/2019 from Elite Legal

22  Network.

23        MR. MOORE:  Oh, I'm sorry.  It is 9/9.  My fault.

24  It was not zoomed in enough.  Strike that.

25    A.  Based on the servicing notes on September 10, 2019,

Page 85

1    it appears the documents were imaged.

2         Q.   Okay.  And then how long does it take for these

3    documents to be processed?

4         A.   Depending on the type of document.

5         Q.   Do you know how long it took this document to be

6    processed?

7         A.   No, I don't.

8         Q.   Okay.  Well, let's look at the next document, then.

9         A.   The same exhibit or a different exhibit?

10        Q.   Now I'm looking at a different exhibit now.  Just a

11   second.  Actually, maybe I don't have it in there.  Well,

12   I'm going to have you look at 9/13.  That's on page 6 of 84

13   of the Life of Loan history and that's at 4:00:05 a.m.  Do

14   you see that?

15        A.   Where it says third party authorization received?

16        Q.   Yeah.  Is it this document or is it some other

17   document?

18        A.   I don't know.

19        Q.   Well, I'm trying to see was this authorization ever

20   approved?

21        A.   For Elite -- we can --

22        Q.   For Elite Legal, yes.

23        MR. MOORE:  If you look at 9/16 up on that same

24   page, it looks like -- just to expedite this -- it looks

25   like they refer to Dan Howard from the legal network as a

Page 86

1    U3P.

2        A.  That would indicate that he was an unauthorized

3    third party.

4        Q.  Okay.  And that's a phone call, right?

5        A.  Yes.

6        Q.  But Elite Legal was authorized at some point,

7    weren't they?

8        A.  I'm looking at the Life of Loan notes to see if they

9    were ever authorized.

10            MR. MOORE:  Page 4, line 20, 4:04 p.m.

11            MS. HENRY:  I believe there's another one before

12    that also.

13            MR. MOORE:  If you can point it to him.

14            MS. HENRY:  I'm asking him first.

15            MR. MOORE:  Okay, if you want to be here all day.

16            MS. HENRY:  Um-hmm.

17        A.  On 9/20/2019 there is a note that says, "Third party

18    authorization complete.  Authorization details already

19    updated.  Below are contact details of authorized third

20    party.  Elite Legal Network" with their address as well as

21    their contact number and fax number.

22        Q.  Okay.  So it took 11 days to add them to the

23    account?

24            MR. MOORE:  Objection to form.

25        A.  I believe that there were issues with the

1  authorization that needed to be corrected.

2      Q.  Were they corrected?

3      A.  The authorization was eventually approved.

4      Q.  And there were two authorizations, weren't there?

5  There's another one on the 23rd, right?

6          MR. MOORE:  Do you want to point him to a specific

7  comment?

8      A.  It says, "Third party authorization complete, Elite

9  Legal Network."

10     Q.  And do you have the documents for those

11  authorizations?

12     A.  The documents that were submitted, they would be

13  part of the file; the entire imaging file that was provided

14  in discovery.

15     Q.  Yeah.  And do you remember seeing those documents?

16     A.  I saw a lot of different documents.  I don't recall

17  one specific document.

18     Q.  Well, I mean I'm asking if you're aware of any

19  document that went out acknowledging their authorization?

20         MR. MOORE:  Objection, asked and answered,

21  argumentative, badgering.

22     Q.  Why would it take over ten days to notate the file

23  with their authorization?

24         MR. MOORE:  Objection, asked and answered.

25         MS. HENRY:  I'm sorry.  I don't recall his answer,

Page 88

1    so maybe he has to repeat it.

2        Q.  Why would it take ten days to get the authorization?

3            MR. MOORE:  He already testified to it.  He already

4    said that there were issues with the authorization.

5        Q.  But we don't know what issues.  What issues are

6    there with the authorization because I'm not aware of any.

7    Can you point to issues in the authorization, Mr. Prudent,

8    in the Life of Loan history?

9        A.  Not from the Life of Loan history.  I don't have the

10   document before me.

11       Q.  Well, you have the two documents that went over.  Do

12   you want -- I'm going to now send you the authorization from

13   the 23rd and the authorization from the 20th.  So this is

14   coming over as two additional documents.  Look at this and

15   we can take two breaks.  I do not know where they are in

16   your documents.  I only know where they are in ours.

17           MR. MOORE:  That's not our obligation.  Thank you.

18           THE WITNESS:  Also, when are we going to break for

19   lunch?

20           MS. HENRY:  I'm willing to break for lunch after

21   this.  But let's just finish the authorization issue before

22   we do that.

23           (Brief recess.)

24           (Exhibits 11 and 12 marked.)

25       Q.  So you've had a chance to look at the two

Page 89

1   acknowledgements.  Maybe I missed it and you did produce

2   those in discovery, and you could correct me if I'm wrong.

3   But do you have reason to dispute that those are letters

4   sent out on September 20th and September 23rd in regards to

5   this account by NewRez and PHH Mortgage Services?

6           MR. MOORE:  Sony, have you received those yet?

7           THE WITNESS:  I haven't received them yet.

8           MR. MOORE:  Sorry, Christina.  They're going

9   through.

10          Sony, I forwarded them.  Let me know when you get

11  them.

12          THE WITNESS:  I'm reviewing them now.

13          MR. MOORE:  Okay.  Thanks.

14          THE WITNESS:  I have reviewed both letters.

15      Q.  Have you seen these letters before?

16      A.  I recall seeing them in the image file, yes.

17      Q.  Do you recall if you produced them because you may

18  have and I may have missed it?

19          MR. MOORE:  I'll represent I believe we did produce

20  these.

21          MS. HENRY:  Okay.

22      Q.  Do you have an objection to using these as the

23  documents for your testimony?

24          MR. MOORE:  Do I have an objection?

25          MS. HENRY:  I'm talking to your client, Mr. Prudent.

 1        MR. MOORE:  He's not a lawyer.  But if you want to

 2    ask him about his assessment of accuracy, I don't have an

 3    issue with that question.

 4        MS. HENRY:  Yeah.  I'm just saying unless he can

 5    find the documents and produce them, I'm asking him to

 6    testify as to these documents, if that's something he agrees

 7    to.

 8    A.   They look as the authentic documents.

 9    Q.   Do you have reason to doubt that they aren't?

10    A.   Not that I can see.

11    Q.   Okay.  So conceding that, can you tell me

12    authorization was agreed to on September 20th and this

13    letter says that the third parties can obtain loan details

14    and make loan payments but they're not permitted to update

15    information on the account; is that correct?

16    A.   That is what the letter states.

17    Q.   So does that mean that PHH did not review and update

18    the account with the fax, the fax information about Ms.

19    Hoover's bankruptcy?

20    A.   The fax, going back to the fax, it was faxed but

21    there isn't an authorization with the fax.  It's just a

22    two-page document.  There is no information regarding Elite

23    Legal Network who gave them authorization onto the account.

24    There was no authorization signed by anyone associated with

25    the account.

1    Q.  Okay.  Let's go back to that because I don't think

2    that that's true.  The document I gave you is three pages.

3    A.  The one I'm looking at is two pages.

4    Q.  Then you're looking at the wrong one.

5        MR. MOORE:  That was what was marked.

6        MS. HENRY:  That's not what I marked, so I'm sending

7    Exhibit 10 over.  I'm sorry.  I don't know what you're

8    seeing.

9        MR. MOORE:  I'm seeing what you sent us as the

10   exhibit.

11   Q.  So I am sending it to you as I speak so we can

12   clarify this.  This is helpful.  Because there are three

13   pages to your fax.

14       MR. MOORE:  The one that I was looking at -- and,

15   Sony, let me know if yours was two pages.

16       THE WITNESS:  The one I'm looking at is two pages.

17       MS. HENRY:  I'm going to send this over to clarify

18   and this should be Exhibit 10.

19       (Exhibit 10 re-marked.)

20   Q.  Do you see the authorization now?

21   A.  Yes.

22   Q.  Okay.

23       MS. HENRY:  So where were we now that that's

24   explained?

25       MR. MOORE:  Objection to form.

Page 92

1          THE WITNESS:  What was the question?

2          (Reporter read back as requested.)

3     Q.  And so now you're looking at page 3 that's the

4  authorization and that's from your documents.  I think you

5  just had them out of order.  So does that clarify your

6  understanding of the authorization?

7     A.  With the authorization page.  I have seen the

8  authorization page, yes.

9     Q.  Okay.  So I think our question was, you said you

10  thought there was problems with the authorization and that

11  led to the delay?

12    A.  Yes.

13    Q.  Is that still your testimony?

14    A.  Let me look at the Life of Loan.  (Witness reviews

15  document.)  Based on the Life of Loan notes, it appears that

16  it took ten days to process the authorization.

17    Q.  Okay.  And then since that notice says that the

18  authorization is limited, was that bankruptcy petition

19  acknowledged in the notes?

20         MR. MOORE:  Objection to form.

21    A.  As far as the bankruptcy, there was a research done

22  for the bankruptcy.

23    Q.  So was that done when Sarah Hoover called in on 9/12

24  or was that done when they got that document and finally put

25  it in the file?

Page 93

1              MR. MOORE:  Objection, form and characterization.

2        Q.  So let me strike that.  Let me ask again.

3            So when was that research done?

4        A.  On 9/16/2019.

5        Q.  And what spurred that research?

6        A.  There was a notification of bankruptcy.

7        Q.  From who?  Is that from the court?

8        A.  It doesn't state where the notification came from;

9   just that there was a notification of bankruptcy and a

10  bankruptcy module could not be opened on the account.

11       Q.  I think I see that.  Before we break for lunch, I'm

12  going to go back to one other comment that you made earlier.

13  You said on 8/28/2019, that was when PHH first learned about

14  the bankruptcy and they were asking for documents and the

15  third party authorization does not fall under SI --

16            MR. MOORE:  You said when he first learned about the

17  bankruptcy.  She hadn't filed for bankruptcy yet.

18       Q.  I'm sorry.  When you first learned about the death.

19  So I'm at the note on 8/28/2019.

20       A.  I'm there.

21       Q.  Okay.  So, again, it says that the third party

22  authorization does not fall under SII purview.  So does that

23  mean that Ms. Hoover is no longer authorized?

24            MR. MOORE:  Objection to form, asked and answered.

25       A.  As I responded before, it says, "Also third party

Page 94

1   authorization does not fall under successor-in-interest

2   purview."  So an authorized third party isn't the same as a

3   successor-in-interest.

4       Q.  Okay.  But she was authorized; this didn't change

5   that, right?

6       A.  It doesn't say that her authorization was removed.

7       Q.  Okay.  So the next day on -- or next two days on

8   8/30/2019 at 2:46:23.  Do you see that note?

9       A.  Which date?

10      Q.  8/30/2019 at 2:46:23.

11      A.  I see that.

12      Q.  So she's an "Authorized third party; completed

13  verification; verified Sarah Hoover, executor or

14  administrator of the estate."

15      A.  I see that.

16      Q.  Okay.  And then when she calls in on 9/12 at 7:32:02

17  it, again, says she's an authorized third party, right?

18      A.  What time?

19      Q.  At 7:32:02 p.m.

20      A.  It states that authorized third party Sarah Hoover

21  called.

22      Q.  Um-hmm.  And so then it says that they could not

23  advise her on the file.  Why is that?

24      A.  I can only read what it says, as it says, "Confirm

25  is not updated as approved.  Advised cannot discuss file."

1      Q.  So what does that mean, because we just looked at

2  the fact that she was approved?

3      A.  Yes.  Without speaking to the individual that put

4  that note there and understanding what that meant, I

5  couldn't say at this time.

6      Q.  So do you know what individual that is?

7      A.  Based on the call that I heard, I believe it was

8  Shelly Robertson.

9      Q.  Okay.  So it says -- so it says that she's an

10  approved third party and they cannot speak to her.  And then

11  the next note above it says she's an unauthorized third

12  party.  Can you tell me what's happening here as to why now

13  she's now unauthorized?

14      A.  Again, without speaking to the person that actually

15  entered it, I can only tell you what the notes state.

16      Q.  Okay.  And then what about on 9/13 when it says,

17  "Reason for delete:  Borrower is deceased."

18      A.  Which time?

19      Q.  9/13 at 7:59:16 a.m.

20          MR. MOORE:  Your question?

21      Q.  Why does it say, "Reason for delete:  Borrower is

22  deceased."  What was deleted?

23      A.  I don't know.

24      Q.  Okay.

25          MS. HENRY:  All right.  We can break for 45 minutes.

Page 96

1          (Lunch recess 12:42-1:32 p.m.)

2     Q.  Okay.  So, Mr. Prudent, were you able to review some

3  of the things we discussed before the break and find any

4  documents that you needed to review?

5          MR. MOORE:  Christina, can you remind us what those

6  were?  We didn't have a list.  On our next break we're happy

7  to look and see if we can find it.

8          MS. HENRY:  When we have a break between then, I

9  will send something up to you.

10         MR. MOORE:  Okay.  Thank you.

11    Q.  So we left off in the Life of Loan history on page 6

12 of 84 around the time of the foreclosure sale on the 13th.

13 And we discussed the authorization for Elite Legal.  So now

14 I'm going to also have you look at the phone call that Sarah

15 Hoover made when she informed PHH about her bankruptcy

16 filing on 9/12 at 12:40:14 p.m.  Do you see that notation?

17    A.  Yes.

18    Q.  Okay.  And it says, new bankruptcy or new bank.

19 "Sarah Hoover filed for bankruptcy" and it has a case

20 number.  "Mary Jo Heston, Chapter 13" and it's "Filed on

21 9/9/19," right?

22    A.  Yes.

23    Q.  So it's listed as "Task tracking."  Can you tell me

24 what "task tracking" means?

25    A.  A new task is being opened up in MSP.

1      Q.  MSP.  And so what happens after a new task is

2   opened up in MSP?

3      A.  It is worked by the appropriate department.

4      Q.  What department would that be?

5      A.  For bankruptcy filings, it would be the bankruptcy

6   department.

7      Q.  So this was on the 12th, the day before the

8   foreclosure sale, right?

9      A.  Yes.

10     Q.  So was it reviewed on the 12th?

11         MR. MOORE:  Objection to form.

12     A.  The task was opened on the 12th.  It doesn't denote

13  in the servicing notes whether it was reviewed on the 12th.

14     Q.  So was it -- what was done on the 12th?

15     A.  The task was opened for a bankruptcy that was filed.

16     Q.  And then what happened?

17     A.  It doesn't state what happened on the 12th after

18  that.

19     Q.  Did you inquire with anyone at PHH about what

20  happened?

21     A.  What happens when a bankruptcy is filed and the

22  person who files bankruptcy isn't related to the loan, then

23  the task is opened up and the bankruptcy department is going

24  to research it to see if they can open a bankruptcy module.

25     Q.  What about when the bankruptcy is the next day and

Page 98

1   what about if the foreclosure is the next day?

2        MR. MOORE:  Objection, compound.

3    A.  I can only state as to the procedure is how it's

4   done and the research that's done when a bankruptcy is

5   filed.

6    Q.  So what does Ocwen do when a bankruptcy is filed the

7   day before a foreclosure and they get notice?

8        MR. MOORE:  Objection to form.  With a borrower or a

9   non-borrower?

10        MS. HENRY:  It doesn't matter.  I just want to know,

11   what do they do in general.

12    A.  If we were speaking of someone who was an actual

13   borrower on the account, then the bankruptcy module is

14   opened and once the research has been completed and

15   confirmed that this person has an interest in the property.

16    Q.  And what about when the person is dead?

17        MR. MOORE:  Objection to form.

18    A.  I don't know that a dead person could file

19   bankruptcy.

20    Q.  Well, I know that.  But when the borrower is dead

21   and someone else related to the account who has

22   authorization on this account who has been listed as the

23   executor, who is listed as a trustee, files bankruptcy, what

24   does Ocwen do when they learn about that the day before a

25   foreclosure sale?

1        MR. MOORE:  Objection, asked and answered.

2     A.  If the person, again, is the borrower, then the

3  bankruptcy module is opened and it's reviewed.

4     Q.  What about if it's an heir?

5     A.  If it's an heir and they're a confirmed

6  successor-in-interest, than the module is opened and they

7  have an interest in the property.

8     Q.  And what if they're not a confirmed

9  successor-in-interest?

10    A.  Then it's going to be researched to see how they're

11  connected to the property, whether there are schedules

12  attached to their bankruptcy filing that shows how they have

13  an interest in the property.

14    Q.  Why wasn't the foreclosure continued?

15        MR. MOORE:  Objection.

16    A.  Continued or...

17    Q.  Continued.  Why wasn't it continued pending this

18  research?

19    A.  I don't know.

20    Q.  Did you ask?

21    A.  I didn't see any notation as to the foreclosure

22  being placed on hold or request to be placed on hold.

23    Q.  Did anybody at PHH inform QLS, the nonjudicial

24  foreclosing trustee, when they found out about the

25  bankruptcy?

1          MR. MOORE:  Objection to form.  When?

2     Q.  When they found out about the bankruptcy on

3  September 12th at 12:40:14 p.m.?  Please answer.

4     A.  As I said before, it notates what it notates.  There

5  is nothing else corresponding to that notation.  There's no

6  other notes or anything else.

7     Q.  So then I'm asking you, yes or no, when they found

8  out about the bankruptcy, did they inform the nonjudicial

9  foreclosing trustee, QLS, on that day?

10    A.  I don't know.

11    Q.  It's a yes or no question.

12         MR. MOORE:  Objection, badgering.  He said he didn't

13  know.

14    A.  I don't know.

15    Q.  And why don't you know?  This is the entire purpose

16  of this deposition.  It's the entire purpose of this

17  lawsuit.

18         MR. MOORE:  I'd like to note the tone of Ms. Henry

19  on this line of questioning.  I would ask that she be

20  respectful to the 30(b)(6) witness.

21         MS. HENRY:  And I am being respectful, Mr. Moore.

22  I'm asking a direct question yes or no and I still do not

23  have an answer.

24    A.  My answer is I don't know.

25    Q.  And why don't you know?

1      A.   I don't know.

2           MR. MOORE:  Objection, badgering.

3           MS. HENRY:  So now I'm going to ask Mr. Moore, I'm

4   in a situation now where you have produced a witness who

5   cannot answer questions on this account.  You have produced

6   a 30(b)(6) witness who is unknowledgeable about issues in

7   this case.  You have produced a 30(b)(6) witness who knows

8   about loan modifications who does not know anything about

9   foreclosure.  You have produced a 30(b)(6) witness who has

10  never been on LPS and doesn't know anything about

11  communication between PHH and the foreclosure so we have a

12  problem.

13          MR. MOORE:  I appreciate all your grandstanding, Ms.

14  Henry, but we have a witness --

15          MS. HENRY:  I'm going to suggest that, you know, at

16  the moment this witness can't answer my questions.

17          MR. MOORE:  He can and he has been.

18          MS. HENRY:  He has not answered my questions.  He

19  does not know the answer yes or no.

20          MR. MOORE:  Please proceed with your deposition, Ms.

21  Henry.

22          MS. HENRY:  Honestly, I will proceed but I will tell

23  you that I am going to be continuing this deposition because

24  you have not produced somebody who can answer the questions.

25          MR. MOORE:  And I will put on the record that we

1  have produced someone who's answered the questions and that

2  we suggested for the issues that we've been discussing about

3  the documents, like the call recordings and other things

4  that are still -- the production is still being rolled out;

5  that we have the deposition on August 20th and you declined

6  and I'll have that in the record as well.

7      MS. HENRY:  And you can have it in the record

8  because that is not the issues that I'm talking about now.

9  I'm talking about basic issues in the case that I have every

10  reason to believe that this 30(b)(6) witness would be able

11  to answer.

12      MR. MOORE:  Thank you.  You may proceed.

13      MS. HENRY:  Well, I'm noting for the record that he

14  does not know whether or not QLS was informed of the

15  bankruptcy when they found out.  He has not spoken to Shelly

16  Robertson who took that phone call on the 12th.

17      Q.  So at what point did QLS communicate with PHH or PHH

18  communicate with QLS about Ms. Hoover's bankruptcy?

19      A.  Looking at the servicing note, I don't see any

20  reference to communication with QLS regarding the

21  bankruptcy.

22      Q.  Did they ever communicate with QLS about the

23  bankruptcy?  Mr. Prudent, this is a fundamental issue in

24  this case.

25      A.  I'm looking at the servicing notes.

1    Q.  So you don't have any knowledge about this just from

2  having reviewed and prepared for today's hearing?

3    A.  Not as to when there was communication between QLS

4  and PHH regarding the bankruptcy.

5    Q.  Do you know if anyone was notified about the

6  bankruptcy besides just opening up a task?

7    A.  Once the task and the research was done, as you

8  could see from the comment September 16, 2019, the results

9  of the task were stated that the bankruptcy module could not

10  be opened as the borrower's details did not match what the

11  bankruptcy's file's details and there were not schedules to

12  verify the filer's interest in the property.

13    Q.  Okay.  So Ocwen regularly ignores bankruptcy filings

14  if they can't determine an interest based off of information

15  they're given; is that right?

16        MR. MOORE:  Objection to form.  Assumes facts not in

17  evidence and characterization.

18    A.  I didn't say that.  As I said, this is the research

19  that was done and there was no verification for the filer's

20  interest in the property.

21    Q.  So were procedures followed in this case for when

22  Ocwen received notice of a bankruptcy?

23    A.  Yes.

24    Q.  And how were they followed?

25    A.  When a bankruptcy is filed by someone who isn't a

1    borrower on the loan and the bankruptcy team can't open it,

2    the call center team will then forward it to bankruptcy for

3    research in which they'll do the research to ensure that

4    this bankruptcy is accurate.  And as you can see from

5    looking on 9/16/2019, that research was done as to why the

6    bankruptcy module couldn't be opened on the loan.

7         Q.  And is that the same procedure for a deceased

8    borrower?

9         MR. MOORE:  Objection to form.

10        A.  It's the policy and procedure that's followed for

11   when bankruptcies are filed and there is to be a module

12   opened up.

13        Q.  So the answer is yes; is that right?

14        A.  It's the same policy and procedure.

15        Q.  Same policy and procedure for a dead borrower and

16   for a borrower who is alive, right?

17        A.  As I stated, a dead person can't file bankruptcy so

18   if they want to insist on Ms. Hoover, then we could use Ms.

19   Hoover's name.

20        Q.  So do you have any special procedures for borrowers

21   who are deceased?

22        MR. MOORE:  Objection.

23        MS. HENRY:  I'm sorry.  Why is there an objection?

24   That's a question.

25        Q.  Does Ocwen have any special procedure for borrowers

Page 105

1   that are deceased?

2        MR. MOORE:  Exceeding the scope of the 30(b)(6);

3   that's the basis of my objection.

4        A.  As I said, there are policies and procedures for

5   bankruptcy filings.

6        Q.  Fair enough.  If you don't -- so there's no special

7   procedures for borrowers who are deceased; it's the same

8   procedure for foreclosures?

9        MR. MOORE:  Asked and answered, objection, badgering

10   the witness.

11        MS. HENRY:  Okay.  I'll move on.  I'm just giving

12   him the opportunity to answer.  So if the answer is the

13   same, then I will move on.

14        Q.  I'm going to ask you to look at the recorded

15   telephone call, which is the document 15.

16        MS. HENRY:  I'm going to ask it be entered as

17   Exhibit 13.

18        (Exhibit 13 marked.)

19        MR. MOORE:  I'm going to object.  Is this the PDF?

20   I'm going to object to the authenticity of this document.  I

21   received this document yesterday.  I've never received a

22   transcript of it beforehand.  Me and my client have not had

23   an opportunity from whenever this was produced, last night,

24   until this deposition to compare the written transcript of

25   this to the actual audio file.  I would like to put that

1    objection on for today.

2         MS. HENRY:  Okay.  I'm still adding it as Exhibit

3    13.

4         Q.  Do you have that?

5         A.  Yes.

6         Q.  Okay.  And you also have the wav file?

7         A.  Yes.

8         Q.  Okay.  I am going to play it now.

9         MS. HENRY:  And do you have that also, Christina?

10        THE COURT REPORTER:  I have it from what you sent

11   over, yes.

12        Q.  So you have the transcript in front of you and I am

13   now going to play the wav file.  So you'll have a chance to

14   compare now, Mr. Moore.

15        (Begins playing audio file.)

16        MS. HENRY:  I'm going to stop for a second.  I'm

17   going to ask you to compare the transcript that I'm giving

18   you as I play this recording.  If you see any discrepancy,

19   please let me know.

20        (Continues playing audio file.)

21        Q.  You had a chance to listen to that.  Is there any

22   objection to the transcript now?

23        MR. MOORE:  On review, there is no objection to the

24   transcript.  But I do want to go back to something that Ms.

25   Henry said earlier in the transcript about Mr. Prudent not

1   being able to talk to Ms. Robertson yet.  This call was

2   produced on Friday, August 7th.  It is August 12th today and

3   we have been attempting to get in contact with Ms. Robertson

4   since then and I requested that this deposition be postponed

5   until August 20th and was told that it cannot be.  And I

6   would like that on the record so that the record reflects

7   that my witness has been very diligently working on getting

8   in contact with Ms. Robertson.

9       Q.  So my question to you, Mr. Prudent, have you

10  listened to this recording prior to the recording that you

11  just heard?

12      A.  Yes.

13          (Discussion off the record.)

14          (Exhibit 14 marked.)

15      Q.  Mr. Prudent, go ahead.

16      A.  Yes, I listened to the call before.

17      Q.  And did Ms. Robertson follow procedures?

18          MR. MOORE:  Objection to form, compound.

19      A.  Based on the call, she stated she was following

20  procedures.

21      Q.  Let me back up.  Maybe I can clarify this.  She said

22  that she could not talk to Ms. Hoover because she was not

23  authorized; is that correct?

24      A.  That is what she stated.

25      Q.  Okay.  I'm confused.  Can you explain to me how

Page 108

1    you're answering my question?

2        A.   You asked if she followed the policy and procedure.

3    Based on what she said, she stated she followed policy and

4    procedure based on what she was looking at.  I haven't had

5    an opportunity to speak with her directly and understand her

6    point of view and what was going on.  I can just go based on

7    listening to the call.

8        Q.   So I'm going to look on the note in the loan life

9    memo history.  What does it actually say about this phone

10   call?

11       A.   This phone call is in two separate instances.

12       Q.   Okay.

13       A.   Where on 9/12/2019, 7:32:02 it says, "Talked to

14   unauthorized third party.  State update.  Complete contact

15   on plan."  And underneath it says, "Authorized third party,

16   Sarah Hoover called regarding foreclosure sale and she filed

17   bankruptcy.  Confirm is not updated with as approved.

18   Advised cannot discuss file."

19       Q.   Okay.  And that's -- do you think that that -- does

20   that summarize this call?

21            MR. MOORE:  Objection to form.

22       A.   Not the entire call.  That's what she notated.

23       Q.   So could you rely on that note and know about the

24   substance of this call?

25            MR. MOORE:  Objection to form.

1      A.   The entire substance of the call, no.

2      Q.   So when you listened to the call, what was the

3   important substance that you found in that call?

4      A.   I don't know that I found any substance; just that I

5   heard them discussing her calling and advising that she

6   filed bankruptcy and whether or not something had been done

7   on the account.  And she stated she did not speak to her

8   because she was not authorized.

9      Q.   Okay.  I think we went through this a minute ago, so

10  I'm looking on 9/10.  And it says, "Third party

11  authorization received."  I assume that that's Elite Legal;

12  is that correct?

13     A.   That's correct.

14     Q.   So I don't think I'm aware of when Ms. Hoover became

15  unauthorized.  So I'm looking on 8/30/2019, "Talked to A3P"

16  -- which is authorized third party -- "Sarah Hoover.

17  Waiting for reinstatement of loan.  Authorized third party

18  completed verification.  Verified Sarah Hoover as executor

19  or administrator of estate."

20          So when did her authorization go away?

21     A.   I didn't see anything in the servicing notes stating

22  her authorization went away.

23     Q.   So why is Ms. Robertson unable to talk to her on

24  September 12th, the day before foreclosure sale?

25          MR. MOORE:  Objection to form.

1      A.  I haven't had an opportunity to speak with Ms.

2  Robertson, so I don't know what she was reviewing when she

3  took this call.

4      Q.  And where does Ms. Robertson work?

5      A.  PHH.

6      Q.  And where is she located?

7      A.  I don't know which location she's in.

8      Q.  Is she located in the United States?

9      A.  As I stated, I don't know which location she works

10  in.

11      Q.  Okay.  Do you think she was aware that there was a

12  foreclosure sale going on the next day?

13          MR. MOORE:  Objection.  He's already testified he

14  hasn't spoken to her yet.

15      Q.  Let me ask it this way -- I'll strike that.

16          In her capacity as a relationship manager on this

17  account, would she know that there was a foreclosure of this

18  house that was going to happen the next day?

19      A.  Again, without speaking to her, I don't know what

20  she would have known at that time.

21      Q.  I'm not asking you for her specifically.  I'm asking

22  you in her capacity as a relationship manager.

23          MR. MOORE:  Objection, speculative.

24          MS. HENRY:  No.

25      Q.  Would a relationship manager know and have

1    information in their tasks and duties as a relationship

2    manager, would they know of when a foreclosure was going to

3    happen on an account.  I think that's a basic question.

4         MR. MOORE:  Same objection.

5         A.  The account, once you go into the account, it would

6    state that there's an upcoming sale date.

7         Q.  Okay.  And where would that be in the account?  When

8    you say "account," what are you referring to?

9         A.  I'm referring to the account at issue.

10        Q.  Meaning MSP?  LPS?  Where would you be looking?

11        A.  In MSP.

12        Q.  So in MSP.  So would that be on the computer screen?

13        A.  It would state there was a foreclosure sale date.

14        Q.  And Ms. Robertson would be looking at that screen

15   when she's talking to Ms. Hoover on the 12th; is that right?

16        MR. MOORE:  Objection.

17        A.  Again, I haven't spoken to her.  I don't know what

18   she would have saw.  I can't ask or speculate as to what she

19   may not have seen.

20        Q.  So it's true, then, that there's other information

21   besides what's in this loan history, right?

22        MR. MOORE:  Objection.

23        A.  Other information, I don't follow.

24        Q.  Well, you've stated before that all the information

25   on the account is in this Life of Loan Memo?

Page 112

1       A.   Interactions on the loan, yes.

2       Q.   Are all these interactions, do they tell you

3   everything you need to know about this account?

4       A.   It will -- whoever notates the account will notate

5   who they spoke with and what the substance of the call was.

6       Q.   Okay.  But in this case the substance of the call

7   was not notated, right?

8       A.   She stated she spoke to an unauthorized third party.

9   She called regarding her foreclosure sale and that she filed

10  bankruptcy and that she couldn't discuss the account.

11      Q.   But all that information is not in that note, right?

12           MR. MOORE:  Objection, asked and answered five

13  times.

14           MS. HENRY:  I'm just trying to see if he thinks that

15  it was an appropriate notation.

16           MR. MOORE:  You just keep asking the same question.

17           MS. HENRY:  Yeah.

18      A.   It was a notation that was placed on the account

19  based on the interaction.

20      Q.   So should she have escalated the matter to someone

21  else?

22      A.   She stated she couldn't discuss the file.

23      Q.   So if you can't discuss the file, then she shouldn't

24  escalate it?

25      A.   That's not what I said.  I said she stated she

Page 113

1    couldn't discuss the file or do anything on the file.

2        Q.  Okay.  But I'm asking you, as far as policies and

3    procedures go at Ocwen and as far as in your capacity in

4    knowing whether this is an error or if this is the way

5    things are done at Ocwen, did she act appropriately or

6    should she have escalated the matter to someone else?

7        A.  Again, she stated she couldn't discuss the account

8    or advise anything on the account so how would she then have

9    escalated it if she couldn't discuss the account.

10       Q.  So no matter what the issue is, if it's not the

11   right authorization, Ocwen is not going to escalate the

12   matter, correct?

13           MR. MOORE:  Objection, asked and answered.

14           MS. HENRY:  Yeah.  I'm just verifying that again.

15       A.  As I stated, she stated she was not authorized on

16   the account and she couldn't discuss the account with her.

17       Q.  Okay.  So I'm going to have you look at document 21.

18           MS. HENRY:  This will now be Exhibit 15.

19           (Exhibit 15 marked.)

20       Q.  Mr. Prudent, have you seen this document before?

21       A.  Yes.

22       Q.  And have you reviewed the circumstances of why this

23   document was sent to Ms. Hoover?

24       A.  Yes.

25       Q.  And can you tell me why this document was produced?

Page 114

1     A.   Produced or sent to Ms. Hoover?

2     Q.   Sent to Ms. Hoover.

3     A.   It was confirming that she had been confirmed as a

4     successor-in-interest on the mortgage account.

5     Q.   And can you tell me what led to PHH and NewRez

6     confirming her status as a successor-in-interest?

7     A.   All of the required documents for confirmation of

8     successor-in-interest were received.

9     Q.   And when were they received?

10    A.   In December of 2019.

11    Q.   And so we can look -- you can go ahead and look at

12    your December notes in the loan history.  Can you tell me

13    when and what documents?

14    A.   (Witness reviews document.)  It doesn't state the

15    exact date documents were received in December or what

16    documents were received in the Life of Loan notes.

17    Q.   So you don't know why this was sent?

18    A.   That's not what I said.

19         MR. MOORE:  Objection, that's not his testimony.

20    Q.   Well, something different happened that all of a

21    sudden she gets this in December.  So what is it that

22    prompts this being sent to her?

23    A.   I recall seeing a letter with all of the required

24    documents that had the death certificate, the will as well

25    as the trust documents for the property.  And that was

Page 115

1    received in December; I recall seeing that.

2        Q.  But was that processed?

3        A.  For the confirmation successor-in-interest

4    confirmation to be sent, it would have to have been

5    processed.

6        Q.  Okay.  Well, I'm going to take you to 12/12/2019,

7    "Unauthorized third party called lawyer.  Wanted information

8    regarding loan.  Advised unable to give assistance."  Do you

9    see that note?

10       A.  I do.

11       Q.  Okay.  And do you see on 12/19, research action

12   taken.  Henry & DeGraaff provided authorization letter.

13   Requested to rescind the sale.  They believe the foreclosure

14   was completed.  Is invalid.  Informed that the letter does

15   not give the executor sign-off therefore unable to share

16   info with them.

17       A.  I see that.

18       Q.  So was it processed because you didn't have the

19   correct authorization, right?

20           MR. MOORE:  Objection.

21       A.  That is what it says; that there was no

22   authorization.

23       Q.  Okay.  So would that be the document or it wouldn't

24   be because it wasn't authorized?

25       A.  If the documents received were still being processed

                                                  Page 116

1    and reviewed for quality control and --

2        Q.  So I mean I'm just asking you, were they?

3        A.  The letter is dated December 24, 2019.  This is

4    before that time, so at some point it was approved.

5        Q.  Were the documents sent in on the 19th?

6        A.  It doesn't say -- I don't see anything regarding

7    documents being imaged or sent on the 19th.

8        Q.  Okay.  So do you know what other documents there

9    would be?

10       A.  No.

11       Q.  Okay.  So you don't know why this authorization was

12   done?

13       MR. MOORE:  Objection to form.  That wasn't his

14   testimony.

15       A.  As I stated before, once the documents were received

16   and was processed, then the successor-in-interest was sent.

17       Q.  Okay.  And is the successor-in-interest the same or

18   different than an executor?

19       MR. MOORE:  Objection to form to the extent you're

20   asking for a legal opinion.  This is a fact witness.

21       A.  I can state that a successor-in-interest

22   confirmation confirms that someone has an interest in the

23   mortgage loan but they don't assume the loan; but all the

24   rights that they have and the documents that they can

25   receive on the loan, and loss mitigation options.

1      Q.  I guess I'm looking at 12/19 and the documentation

2   that says the executors haven't signed it.  So that's why

3   I'm asking, is there a difference between a

4   successor-in-interest and executor?

5          MR. MOORE:  Same objection.

6      A.  I don't know legally what an executor means in this

7   instance.

8      Q.  I'm not actually asking for a legal opinion.  I'm

9   asking for how PHH uses those terms because your letter uses

10  successor-in-interest; but in the loan history, they're

11  using the word executor?

12     A.  They're using executor as someone who has an

13  interest in the property that would sign on behalf of the

14  deceased borrower.

15     Q.  So are they equivalent terms as far as Ocwen is

16  concerned?

17         MR. MOORE:  Objection, same objection.

18     A.  I don't know if they are equivalent terms.

19     Q.  Okay.  So by December 24th, 2019 the property has

20  already been sold, right?

21     A.  Yes.

22     Q.  So what did Ocwen do when they determined that Sarah

23  Hoover was the successor-in-interest on December 24th, 2019?

24         MR. MOORE:  Objection to form.

25     Q.  Let me state it again.  Did they do anything when

1    they determined -- when they finally determined that Sarah

2    Hoover was the successor-in-interest on December 24th, 2019?

3        A.  There were a lot of research requests on the

4    account, but that's what I see; once she was confirmed as

5    successor-in-interest.

6        Q.  And did they move to rescind the loan -- I mean to

7    rescind the sale?

8        A.  I didn't see anything in that regard to rescinding

9    the sale.

10       Q.  Okay.  And I'm going to have you look at the note on

11   January 7th, 2020.

12       A.  I'm there.

13       Q.  So it says -- or actually it starts above.  So do

14   you know who Sierra West is?

15       A.  No.

16       Q.  Okay.  So she's asking for something.  What is she

17   asking for?

18       A.  She's asking, from what I can gather, that she filed

19   bankruptcy.  She's an heir.  She claimed an interest in the

20   property.  The property sold to a third party and are

21   seeking to validate the sale in bankruptcy.  PHH needs a

22   formal response to the date they were first notified that

23   Ms. Hoover claimed an interest in the property and provided

24   notice to PHH that she filed a bankruptcy.

25       Q.  Okay.  And if I told you that Sierra West works for

Page 119

1   QLS, who is a nonjudicial foreclosure trustee, does that

2   ring a bell for you?

3       A.  If she works for them, I still wouldn't know who she

4   is.

5       Q.  Do you know who she is in relation to this file?

6           MR. MOORE:  Objection, asked and answered.

7       Q.  Okay.  So you don't know who she is.

8           So I'm telling you she works for QLS.  She's the

9   nonjudicial closing trustee.  Assume that's a fact for the

10  moment.  Do you know if anyone got back to her?  She does

11  not work for Ocwen or PHH.

12      A.  I don't see a direct comment addressing Ms. West's

13  concern.

14      Q.  Okay.  But do you know the answer?

15      A.  If someone ever got back to her, I don't know.

16      Q.  No, no.  I'm saying that she's asking when did --

17  when was PHH first notified of Ms. Hoover's bankruptcy

18  filing.

19          MR. MOORE:  I'll object to the extent that that

20  involves -- the first part of that inquiry involves --

21  actually, both parts of that inquiry involve a legal

22  analysis and Mr. Prudent is not an attorney.

23          MS. HENRY:  All right.  Strike that.

24      Q.  So no one got back to her right?

25      A.  I don't see any notation speaking to her in regard

Page 120

1  to that.

2      Q.  Okay.  And the next notation above, sending proof

3  that the bankruptcy was filed by an heir.  And that wasn't

4  sent either, was it?

5      A.  Which one?  What time stamp date?

6      Q.  It looks like 1/8/2020.

7          MR. MOORE:  What time?

8          MS. HENRY:  At 3:37.

9      A.  It states, "Servicer action required.  Comments:  We

10 sent this request to our internal team for review but can

11 you please provide the proof of BK filed a borrower's heir,

12 so accordingly we can send to our internal team for review."

13     Q.  Right.  So that wasn't followed up on either, right?

14         MR. MOORE:  Objection to form.

15     A.  That was on 1/15/2020, "BK review completed loan

16 received in BKV mailbox as bankruptcy filed by third party

17 but it's zero UPB loan so replied BK cannot be opened."

18     Q.  Okay.  What does that mean?

19     A.  That it was forwarded to the internal department for

20 review but the loan balance was zero, so a bankruptcy module

21 could not be opened on the loan.

22     Q.  Oh.  So a bankruptcy module could not be opened

23 because the loan balance was zero?

24     A.  Yes.

25     Q.  But they did acknowledge that the bankruptcy had

Page 121

1    been filed and received by Ms. Hoover, right?

2        A.  I don't know that it says that.  It says, "BK review

3    completed loan.  Received in bankruptcy.  BK filed by third

4    party."

5        Q.  So you're not sure if it's Ms. Hoover?

6        A.  If it's the BK that's filed by the third party, that

7    would be Ms. Hoover.

8        Q.  Okay.  But they couldn't do anything because there's

9    a zero loan balance, right?

10       A.  That is what it says.

11       Q.  Okay.  Now, I'm going to look at the document that's

12   labeled 25.

13           MS. HENRY:  That will now be Exhibit 16.

14           (Exhibit 16 marked.)

15       Q.  Do you have that?

16       A.  I do.

17       Q.  Okay.  And I want you to take a minute to review

18   these four pages of emails and let me know if you have seen

19   these emails before?

20           MR. MOORE:  I would just object to this exhibit to

21   the extent that if you're asking Mr. Prudent to testify to

22   this, my objection would be on part on the chain of this

23   email that is strictly between QLS employees.  Obviously,

24   Mr. Prudent is not here to testify on behalf of QLS.

25           MS. HENRY:  Agreed.

1    Q.  I'm not asking you to testify on that, but I don't

2   have a document that doesn't include that email.  So the

3   email at the top, it's dated 9/27/2019.  That's an internal

4   email between parties at Quality Loan Service.  I'm not

5   asking you to testify regarding that email.  But the other

6   emails I am, okay, Mr. Prudent.  Does that help?

7    A.  I understand.

8    Q.  Okay.

9    A.  I'm done reviewing the document.

10   Q.  Okay.  We're going to start on the top there from

11  Christy Young to Kristen Oswood.  And then below that is

12  some other parties from Ocwen.  First of all, is Christy

13  Young -- I'm not actually sure about this.  But is that

14  someone who works for Ocwen or is that someone outside of

15  Ocwen?

16   A.  Christy Young or Oswood?

17   Q.  Oswood I know works for Quality Loan.  But this

18  other person at the top of that email on September 27th,

19  that's an email that's outside of Ocwen or is that someone

20  from Ocwen sending it to Kristen Oswood?

21       MR. MOORE:  It looks like a McCarthy Holthus email.

22       MS. HENRY:  Okay.  Thank you.

23   Q.  So and then let's look at the one that is from

24  Siddharth Shinde on September 27th, 2019.  Have you reviewed

25  this email before today?

Page 123

1      A.  No.

2      Q.  It was sent by someone at Ocwen Financial Solutions

3   Private Limited, right?

4      A.  Yes.

5      Q.  And is this email noted in the Life of Loan Memo?

6          MR. MOORE:  Object to the form of that question.

7      A.  I did not see this email in the Life of Loan

8   servicing session.

9      Q.  Is there anything in there on September 27th noted

10  at all?

11     A.  There is no notation on September 27, 2019.

12     Q.  And why would that be?

13     A.  I don't know.

14     Q.  And who is Ocwen Financial Solutions Private

15  Limited?

16     A.  That, again, is another one of the subsidiaries that

17  I mentioned earlier.

18     Q.  Okay.  And what is their role in this account?

19     A.  They are a part of the servicing.

20     Q.  Servicing or foreclosure?

21     A.  Foreclosure is still servicing the loan.

22     Q.  Okay.  And so at what stage did they become involved

23  in this account?

24     A.  This one seems to be based on confirming if the

25  foreclosure sale stands or if it's invalid.

Page 124

1    Q.  Is there any notice on the Life of Loan history in

2  September inquiring as to whether the foreclosure sale was

3  valid or invalid?

4        MR. MOORE:  For the whole month of September?

5        MS. HENRY:  Yeah.

6    Q.  After the sale.

7    A.  (Witness reviews document.)

8    Q.  Well, let me just stop you for a moment.  Before you

9  saw this email today, were you aware that in September -- or

10  were you aware at any time since the foreclosure sale that

11  Ocwen was inquiring as to whether the sale was valid?

12   A.  Prior to this email, no.

13   Q.  Okay.  And can you tell me, Mr. Shinde and then this

14  other person who also works for Ocwen Financial Corporation

15  as a team lead in foreclosure -- the last name starting with

16  V-A-G-H-E-L-A -- is he located in the United States or is he

17  located outside of the United States?

18   A.  I don't know where he's located -- he or she.

19   Q.  Right, I don't know either.  When it says "team lead

20  in foreclosure," is there more than one team lead or is he

21  the head of the foreclosure operation?

22   A.  He is the team lead for the team that he's on.

23   Q.  So are there lots of teams?

24   A.  There could different teams, yes.

25   Q.  So do they handle the foreclosure communications

Page 125

1    with the local foreclosing trustees?

2        A.  They would be part of the team that handles

3    communication with foreclosure counsel or trustee.

4        Q.  So Ocwen Financial Corporation does that instead of

5    PHH?

6            MR. MOORE:  Objection to form.

7        A.  Not necessarily.  He could be employed by Ocwen

8    Financial but do it on behalf of PHH.

9        Q.  Okay.  But he lists here in his signature line that

10   he's a team lead in foreclosure for Ocwen Financial

11   Corporation, right?

12       A.  That is what it says in his signature.  I would have

13   to go in to find out who he's employed by through HR.

14       Q.  Okay.  But I think my question is actually a little

15   simpler than that.  Would he notate his actions on this

16   account in MSP if he works for Ocwen Financial Corporation?

17       A.  I didn't see any notations, as I stated before, on

18   September 27, 2019.

19       Q.  Because my question is if he's not a line person at

20   PHH but in some other entity which also deals with

21   foreclosures, do they input their notes in some other

22   system?

23       A.  I don't know.  The only system of record for all

24   loans is MSP and the imaging system.  That's where all the

25   information for loans are kept.

1    Q.  We're finding that all of these emails are not

2  notated in this file, right?

3          MR. MOORE:  Objection, argumentative.

4    A.  I don't normally see the emails that are commented

5  in the comment logs.

6    Q.  You don't see them notated in the comment logs.  So

7  where are they -- then how do you keep track of them for the

8  account?

9          MR. MOORE:  Objection, that wasn't his testimony.

10   A.  As I stated, I don't generally see that emails are

11  placed in the comment logs.  There may be some restating

12  that an email was sent but not the substance of the email.

13   Q.  Okay.  So can you obtain emails related to this

14  account that were sent by Ocwen or received by Ocwen from --

15  let's say September 9th through January 15th -- can you find

16  all those emails and produce them?

17         MR. MOORE:  This exceeds the scope.  I'm happy to

18  have this conversation with you, Christina; but this is not

19  for Mr. Prudent.

20         MS. HENRY:  I'm trying to understand where they're

21  at because it's the first time he's seen them.

22         MR. MOORE:  The way that you framed that question is

23  not for a fact witness.

24         MS. HENRY:  I don't know why they weren't produced

25  and I don't know why he didn't review them; that's what I'm

Page 127

1   trying to understand.

2       Q.  So they don't go into Idesk; is that correct?

3       A.  I have seen some emails in Idesk.

4       Q.  Are there procedures as to when emails are imaged

5   into Idesk and when they're not?

6       A.  For specific reasons if there's communication, it's

7   imaged in Idesk, as you saw with the emails relating to Ms.

8   Robertson.

9       Q.  So are those emails only for communications with the

10  borrower, but not communications with other people; is that

11  what it is?  I'm trying to understand why these emails were

12  not in Idesk.

13          MR. MOORE:  Actually, he's already answered.

14      Q.  I'm trying to figure out from a policy and procedure

15  standpoint, which emails go in there and which don't?

16          MR. MOORE:  Objection.

17          Answer if you know.

18      A.  I don't know as to which emails are imaged and which

19  are not.

20      Q.  Okay.  Now I'm going to the email on the 26th from

21  Cariese Siler, I believe.

22      A.  I see that email.

23      Q.  Okay.  And she is in the foreclosure referral and

24  commencement holds, right?

25      A.  That is what the signature states.

1    Q.  So can you explain to me -- it says, "The BNK

2    workstation is not active and DLD HAMP does not handle this

3    process, for BNK or rescinding sales.  Let me loop in some

4    team players that could to assist to see if bankruptcy was

5    actually filed and they can provide you with the information

6    needed."  Does that give you any more context as to what's

7    happening on this file?

8    A.  Again, having only seen these today, just that

9    research was being done on the account as to what was going

10   on with the bankruptcy.

11   Q.  Let's go down below to the last email on September

12   19th.  So this communication is on the Life of Loan history,

13   right?

14   A.  One moment.  There is a comment referring to

15   speaking to Ms. Hoover and her attorney from the legal

16   network and for foreclosure sale that occurred on

17   September 13 that it should be rescinded and advised BK task

18   open.  Call back Monday.

19   Q.  Okay.  So is this what happens when a BK task is

20   opened?

21   A.  It's the same as when the model was attempted to be

22   -- when you're attempting to open a BK task to research the

23   account and see if a bankruptcy module could be opened on

24   the account.

25   Q.  Okay.  So every time we see a task that's opened,

1    we're likely going to see a chain of emails; is that right?

2          MR. MOORE:  Objection.

3       A.  I didn't say that and I don't know if that's what

4    happens.

5       Q.  Okay.  Well, I'm trying to figure out what happens

6    when a task is opened.  I have one example, so I am trying

7    to find out key events in this file as to what happened when

8    a task was opened because I can see a task on the Life of

9    Loan history.

10      A.  The task was opened and it would go to the

11   appropriate department for the research that needs to be

12   done on the account.

13      Q.  And when research is done, there's emails associated

14   with research; is that right?

15         MR. MOORE:  Objection.

16      A.  If that is how they're conducting research.

17      Q.  And if it's something else, what would it be?

18      A.  If it's just reviewing the loan file itself going

19   through documents and different things, then that would be

20   the way that the research is done.

21      Q.  And then it would be reported back to the line

22   operator or the customer service person?

23      A.  It would be documented on the account.  Or if they

24   have the ability, they may contact the person authorized on

25   the account.

Page 130

1      Q.  Okay.  So then I'm going to have you look at

2   document 27, which is now Exhibit 17.

3           (Exhibit 17 marked.)

4      Q.  Do you see that?

5      A.  Yes.

6           MR. MOORE:  Again, I want to make the same objection

7   that I made to the last one.  In fact, this document is just

8   QLS -- never mind.  Strike that.

9      Q.  Okay.  Do you have this document open?

10     A.  Yes.  Is it two pages?

11     Q.  Yes.  And the date on this document?

12     A.  The received date is January 5th, 2020.

13     Q.  And it's from Quality Loan Service to Andrea Quick.

14  Is Andrea Quick an employee at PHH?

15     A.  She is an employee.  I'm not sure if she's employed

16  by Ocwen or PHH.

17     Q.  Okay.  So she received this message.  And go ahead

18  and review it.  Just let me know when you're ready.

19     A.  (Witness reviews document.)  I'm done reviewing it.

20     Q.  And this is dated January 5th.  Do you have this

21  communication on this Life of Loan history?

22     A.  I don't see any entries for January 5th, 2020.

23     Q.  Okay.  And do you know whether PHH has the social

24  security number for Ms. Hoover on their files?

25     A.  I wouldn't be able to tell from this document as it

1  wouldn't list her social security number for security

2  purposes.

3     Q.  Right.  I don't mean this document.  I mean, in

4  general, does PHH have her social security number?

5     A.  If she -- when she applied for loss mitigation, she

6  may have included her social security number on the

7  application.  I would have to see the application to

8  confirm.

9     Q.  So you reviewed a lot of documents that were sent

10 over in production and there were quite a few documents with

11 loan modification information, correct?

12    A.  Yes.

13    Q.  And that information all had a social security

14 number on it for Ms. Hoover, right?

15    A.  That's not what I said.  I said I would have to

16 review it to confirm that there is a social security number

17 on those documents.

18    Q.  Have you ever seen a loan modification application

19 that did not have one?

20    A.  Some people tend not to include their social

21 security number on there and it would be kicked back for an

22 incomplete document.

23    Q.  Well, we'll take a break in a few minutes and I'll

24 have you go ahead and take a look at that and confirm

25 whether or not PHH has her social security number and which

Page 132

1    social security number they have.

2         MR. MOORE:  If you have a document you want to show

3    him, show him the document.

4         MS. HENRY:  I don't have a document to show him.  I

5    want to verify whether or not they have her social security

6    number and what social security number they have.

7         MR. MOORE:  And he's testified that, sitting here

8    today without a document in front of him -- he needs a

9    document to confirm.

10        MS. HENRY:  Okay.  Fair enough.  At the break I will

11   give him a document to look at.

12        MR. MOORE:  That would be very helpful.  Thank you.

13        MS. HENRY:  And let's go on to the next document,

14   which is listed as my document 28, which is now Exhibit 18.

15        (Exhibit 18 marked.)

16    Q.  I'll have you review this document.

17        MR. MOORE:  After this one, could we take a five

18   minute bathroom break?

19        MS. HENRY:  Um-hmm.

20    Q.  And, again, the document at the top is an email that

21   is not directed to PHH, so I will not be asking you

22   questions about that.

23    A.  (Witness reviews document.)  I'm done reviewing.

24    Q.  Okay.  So on January 6th, 2020 Sarah Hoover was

25   considered a successor-in-interest on the property, correct?

Page 133

1      A.  As of January 6th based on the letter sent in

2  December, she was a successor-in-interest relating to the

3  property.

4      Q.  Okay.  So why is Andrea Quick saying that there was

5  no proof that the heir was linked to the property?

6          MR. MOORE:  Objection to form.  That's not what the

7  email says.

8      A.  I can only state the email says what it says.  It

9  says, the third party called in multiple times stating that

10  they are the heir.  The proof that was provided was not

11  sufficient since the document was not executed.  On 9/16 our

12  bankruptcy team confirmed that the bankruptcy module would

13  not open since there was no proof that the heir was linked

14  to the property.  So just looking at that, it's based on

15  before she was confirmed as a successor-in-interest, so it's

16  referring to the specific time frame in September, is what

17  the inference I can get from this email.

18      Q.  Okay.  Well, going down below, this is the email we

19  saw a few minutes ago.  On the 5th she's responding to this

20  email on the 5th, right?

21      A.  The email from the 5th, yes.

22      Q.  So it says, "There was a BK filed by the borrower's

23  heir in which she claimed an interest in the property.  Here

24  the property sold to a third party purchaser on September 13

25  and they are seeking to validate the sale."

Page 134

1          Two questions:  "The heir, Sarah Hoover, did she

2     ever communicate to PHH she filed bankruptcy and if so,

3     when?"

4          Number 2, "The heir, Sarah Hoover, appears to have

5     filed BK with the" -- social security number listed there --

6     "What social security number does PHH have for Ms. Hoover

7     and how was that number provided to PHH?"

8          So I'm looking at her response and I don't see a

9     response to those two questions, do you?

10     A.  Exact verbatim answering these questions, she

11     answered it the way she answered it.

12     Q.  Okay.  So now I'm going to ask you to answer that.

13     If you answered those two questions, how would you answer

14     them?

15          MR. MOORE:  Objection to form.

16     A.  What was that?  I didn't catch the last part.

17     Q.  Well, we'll wait for the second one because you're

18     going to confirm the social security number at the break.

19          MR. MOORE:  Objection to form, compound.  Can you

20     address them one at a time, Christina?

21          MS. HENRY:  Yes.  Yes, I can.

22     Q.  So in answer to that question, as of January 5th if

23     you're answering this, did she ever communicate to PHH that

24     she filed bankruptcy and if so when?

25          MR. MOORE:  I would just object to the fact that,

Page 135

1   again, the heir -- I would object to the fact that there's

2   some type of legal conclusion being sought.  If you're just

3   asking him when was it communicated to PHH that Sarah Hoover

4   filed for bankruptcy, I don't have a problem with that

5   question.

6           MS. HENRY:  That's what I'm asking him.

7           MR. MOORE:  Okay.

8       A.  Ms. Hoover communicated in early September that she

9   filed bankruptcy.

10      Q.  Okay.  Before the 13th, correct?

11      A.  Yes.

12      Q.  And then by January 6th you had already determined

13  that she had an interest in the property because you listed

14  her as a successor-in-interest, right?

15      A.  She was listed as a successor-in-interest in the

16  property by January.

17      Q.  Okay.

18          THE WITNESS:  Can we take that bathroom break now,

19  if possible?

20          MS. HENRY:  I think we can, yes.

21          (Brief recess.)

22      Q.  Okay.  I have a document that I sent to you which is

23  going to be Exhibit 19.

24          (Exhibit 19 marked.)

25      Q.  Have you had a chance to look at that?  This is the

1   earliest document I could find in your files with your Bates

2   number on it for Ms. Hoover's social security number.

3       A.  Yes, I have had an opportunity to review it.

4       Q.  Without putting any information on the record as far

5   as the actual number, I'm going to have you compare that

6   social security to the number on Exhibit 18.

7       A.  They are the same number.

8       Q.  Okay.  Thank you.

9           MS. HENRY:  I believe that concludes the testimony.

10          One more thing.  Sorry.  Number 34 of my documents,

11  let's make that Exhibit 20.

12          (Exhibit 20 marked.)

13      Q.  Do you have that, Mr. Prudent?

14      A.  One moment.  No, I didn't get 34 in the documents.

15  It stops at 33.

16      Q.  Okay.  I will email you number 34 to your counsel.

17          MR. MOORE:  Christina, it hasn't come in yet.

18          MS. HENRY:  It would have been on the prior links I

19  sent, too.  It might be too big, maybe.  I don't know.

20          MR. MOORE:  I just got it.

21      Q.  Do you have it now, Mr. Prudent?

22      A.  Not yet.  It hasn't come through.

23          MR. MOORE:  It's a few megabytes so it might take a

24  minute.

25      A.  Okay.  I just received it.

Page 137

1      Q.  Okay.  Have you seen these documents before?

2      A.  No, I have not.

3      Q.  Are you aware of what a nonprobate notice to

4   creditor proceeding is?

5      A.  No.

6          MS. HENRY:  Okay.  That's all the information that I

7   have for this witness.

8          MR. MOORE:  Okay.  I have a few questions.

9                       EXAMINATION

10  BY MR. MOORE:

11     Q.  Good afternoon, Mr. Prudent.  Thank you for your

12  time today.  Ryan Moore on behalf of PHH, NewRez, and HSBC.

13  Can you tell me when is the first time that Mr. -- that Mr.

14  or Ms. Hoover informed PHH that Mr. Suleiman had passed

15  away?

16     A.  When the account was notated in January 2019 that he

17  had passed away.

18     Q.  Okay.  When that occurred, what did PHH send --

19  well, strike that.

20         When that occurred, how did PHH notate Ms. Hoover on

21  the account?

22     A.  As being authorized on the account.

23     Q.  As an authorized third party; is that correct?

24     A.  Yes.

25     Q.  Okay.  Was she identified as an authorized third

Page 138

1    party as co-trustee of the Suleiman Trust?

2        A.  Yes, with her brother.

3        Q.  Okay.  And then at that time what did PHH, if you

4    recall, send to Ms. Hoover for her options with respect to

5    getting further authorization other than the authorized

6    third party?

7        A.  What was sent would have been the package to assume

8    the loan or become a successor-in-interest on the loan and

9    certain documents that were required if there was an

10   assumption.

11       Q.  From your review of the image file, were both of

12   those sent to Ms. Hoover?

13       A.  Yes.

14       Q.  Did Ms. Hoover ever send in documents in response to

15   the confirmed successor-in-interest before she filed

16   bankruptcy?

17       A.  The documents that she sent in was for a loan

18   assumption.

19       Q.  So she never completed the successor-in-interest

20   form before she filed bankruptcy?

21       A.  In March of 2019 a reminder was sent for her to

22   complete the successor-in-interest form with the required

23   documents to be a successor-in-interest and that wasn't

24   completed.

25       Q.  Okay.  And then with respect to the assumption

1   documents, you testified that she did fill out those

2   documents, correct?

3        A.  Her and Mr. Hoover.

4        Q.  And what was PHH's or Ocwen's response to those

5   documents?

6        A.  That additional information was needed as well as a

7   title to the property as it was still with the deceased

8   borrower and through the trust.

9        Q.  Did she provide those required documents before she

10  filed bankruptcy?

11       A.  Those documents transferring the property, no.

12       Q.  Did she provide a response to the confirmed

13  successor-in-interest document before the sale occurred in

14  September 2019?

15       A.  No.  It was for a loan modification and assumption.

16       Q.  Okay.  When she called in on September 12th, 2019

17  and spoke with Ms. Robertson, is it your understanding that

18  at that time she had no higher authorization than authorized

19  third party?

20       A.  She would have been seen as only an authorized third

21  party on the account.

22       Q.  She was not seen as a confirmed

23  successor-in-interest at that point; is that your

24  understanding?

25       A.  Not at that time.

Page 140

```
 1            MR. MOORE:  I have nothing further.

 2            MS. HENRY:  So I just have one clarification.

 3                          EXAMINATION

 4   BY MS. HENRY:

 5       Q.  On September 12th she wasn't even listed as a third

 6   party, right?  I mean you listened to the voice mail, just

 7   like I did.  Ms. Robertson wasn't allowed to talk to her

 8   about anything.  Am I wrong?

 9       A.  That's what Ms. Robertson states.

10       Q.  Okay.

11            MR. MOORE:  I don't have anything further.

12            (Discussion off the record.)

13            MS. HENRY:  It is fine to put on the record that he

14   can waive signature.

15            MR. MOORE:  Okay.  Thank you.

16            MS. HENRY:  Well, I mean it's up to your client to

17   waive signature but I think we agreed that our client was

18   going to.

19            MR. MOORE:  I just want to put on the record that

20   that's a mutual.

21            MS. HENRY:  That was a mutual agreement.  So we went

22   over an email with documents from January 11th of 2020 and

23   that wasn't produced.  And is that something that can be

24   followed up on and produced by Mr. Prudent?

25            MR. MOORE:  I'm happy to look into it.  I think you
```

Page 141

1    mean January 11, 2019.

2         MS. HENRY:  Yes, 2019.

3         MR. MOORE:  I'm happy to look into it.

4         MS. HENRY:  And Mr. Prudent also said that he did

5    not have knowledge about whether or not LPS could download

6    their note documents into a file onto itself.  I would also

7    like information as to whether or not that is true.  Because

8    if those documents can be found, I would like those

9    produced.

10        MR. MOORE:  We'll look into that as well.

11        MS. HENRY:  I also did not find the documents from

12   September 20th and September 23rd acknowledging

13   authorization for Elite Legal.

14        MR. MOORE:  I believe those were produced, so I

15   think we might -- I think it might just be a -- unlike the

16   other ones, I think we produced those, but I'm happy to

17   look.  I think those are in our production.

18        MS. HENRY:  Well, if it's there, I apologize.  But

19   I've looked and looked and looked and I haven't found them.

20   There's still a lot of documents, so perhaps I missed it.

21   But I would like to, if I have the actual document from PHH,

22   I would prefer to switch that out to the real document.  But

23   I could not find that anywhere.

24        MR. MOORE:  Okay.  I would ask that you look one

25   more time, but yeah.

1      MS. HENRY:  And I would also ask that we be given

2   all email correspondence between Shelly Robertson and Ms.

3   Hoover which has not been produced yet.

4      MR. MOORE:  So we produced all Shelly Robertson

5   emails that were part of the image file, and I believe that

6   is everything.  As I said to you before, those were just in

7   draft form.  I'm happy to follow up with Shelly.

8      MS. HENRY:  Let me have a caveat because I think I

9   actually misspoke.  I need all emails that Shelly Robertson

10  is on related to this account, so that would include other

11  parties, not just Ms. Hoover.

12     MR. MOORE:  I think we will have to have a

13  conference with respect to that at some point after this

14  deposition to talk about it further.

15     MS. HENRY:  And the other thing is we also don't

16  have a witness with knowledge about the foreclosure

17  procedures and communications with the foreclosure trustee

18  and, in general, what foreclosure procedures are in play

19  here.  He didn't know any of the parties that are doing the

20  research and didn't know what happens for various tasks that

21  are opened as to other documents or places they went.  And

22  you produced an unknowledgeable witness that hadn't talked

23  to anybody outside of looking at the loan history.  So I am

24  requesting, and will be requesting, another person to

25  testify about that as a 30(b)(6).

Page 143

1        MR. MOORE:  And I will respectfully disagree with

2    your characterization and also put on the record again that

3    my witness was knowledgeable -- is knowledgeable.  And with

4    respect to the QLS issues, we were notified about those

5    emails on Monday night.  And I told you that if we had until

6    August 20th, we could research those and you refused to

7    grant me that reasonable request.  So the record will

8    reflect that.

9        MS. HENRY:  And the record will reflect that the

10   witness knew nothing about the foreclosure proceedings and

11   the foreclosure communications even though those were

12   questions in the interrogatories and request for production.

13       MR. MOORE:  I disagree with your characterization.

14       MS. HENRY:  And also in the notice of deposition.

15   So I think that's it.

16       MR. MOORE:  Okay.

17       (Concluded at 3:22 p.m.)

18       (Signature waived.)

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

   STATE OF WASHINGTON  )
3                       )ss
   COUNTY OF SNOHOMISH  )

4

5          I, the undersigned Washington Certified Court
   Reporter, hereby certify that the foregoing deposition upon
6  oral examination of 30(b)(6) PHH MORTGAGE CORPORATION DBA
   PHH MORTGAGE SERVICES, DESIGNEE:  SONY PRUDENT was taken
7  stenographically before me on August 12, 2020 and
   transcribed under my direction;

8
           That the witness was duly sworn by me pursuant to
9  RCW 5.28.010 to testify truthfully; that the transcript of
   the deposition is a full, true, and correct transcript to
10 the best of my ability; that I am neither attorney for nor a
   relative or employee of any of the parties to the action or
11 any attorney or counsel employed by the parties hereto nor
   financially interested in its outcome.

12
           I further certify that in accordance with CR 30(e),
13 the witness was given the opportunity to examine, read and
   sign the deposition, within 30 days, upon its completion and
14 submission, unless waiver of signature was indicated in the
   record.

15
           IN WITNESS WHEREOF, I have hereunto set my hand this
16 24th day of August, 2020.

17

18

19    \S\CHRISTINA ATENCIO

20    _____
      Washington Certified Court Reporter No. 2749
21    License expires November 6, 2020

22

23

24

25