UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON

|  |  |  |
|---|---|---|
|  | . | Case No.  19-42890-MJH |
| IN RE: | . |  |
|  | . | Chapter 13 |
| SARAH HOOVER, | . |  |
|  | . |  |
|         Debtor. | . |  |
| . . . . . . . . . . . . . | . |  |
|  | . |  |
| SARAH HOOVER, | . | Adv. No. 20-04002-MJH |
|  | . |  |
|         Plaintiff, | . |  |
|  | . |  |
|     v. | . |  |
|  | . |  |
| QUALITY LOAN SERVICE | . | 1717 Pacific Avenue, Suite 2100 |
| CORPORATION OF WASHINGTON, | . | Tacoma, WA 98402 |
| et al., | . |  |
|  | . | Friday, November 20, 2020 |
|         Defendants. | . | 9:01 a.m. |
| . . . . . . . . . . . . . | . |  |

TRANSCRIPT OF MOTION FOR SUMMARY JUDGMENT WITH
NOTICE OF HEARING [13];
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (PARTIAL) WITH NOTICE
OF HEARING [42];
MOTION FOR SUMMARY JUDGMENT RENEWED (DKTS #13 AND #29) WITH
NOTICE OF HEARING [58];
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT WITH
NOTICE OF HEARING [62];
MOTION FOR SUMMARY JUDGMENT WITH NOTICE OF HEARING [65]
**BEFORE THE HONORABLE MARY JO HESTON VIA TELECONFERENCE**
**UNITED STATES BANKRUPTCY COURT JUDGE**

TELEPHONIC APPEARANCES:

For the Plaintiff:          Henry & Degraaff, P.S.
                            By:  CHRISTINA L. HENRY, ESQ.
                            787 Maynard Avenue South
                            Seattle, WA 98104
                            (206) 330-0595

TELEPHONIC APPEARANCES CONTINUED.

Audio Operator:            Courtroom ECRO Personnel

Transcription Company:     Access Transcripts, LLC
                           10110 Youngwood Lane
                           Fishers, IN 46038
                           (855) 873-2223
                           www.accesstranscripts.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

TELEPHONIC APPEARANCES (Continued):

For PHH Mortgage           Houser Law LLP
Corporation,               By:  ROBERT W. NORMAN, ESQ.
HSBC Bank USA, N.A.,        9070 Research Drive
and NewRez, LLC:           Irvine, CA 92618
                           (949) 679-1111


For IH6 Property           Schweet Lindt & Coulson
Washington, LP:            By:  JOHN ANTHONY MCINTOSH, ESQ.
                           575 South Michigan Street
                           Seattle, WA 98108
                           (206) 381-0118


For Quality Loan           McCarthy & Holthus LLP
Service Corporation        By:  JOSEPH W. MCINTOSH, ESQ.
of Washington:             108 1st Avenue South, Suite 300
                           Seattle, WA 98104
                           (206) 319-9049

1    (Proceedings commence at 9:01 a.m.)

2         THE COURT:  -- for summary judgment and partial

3    summary judgment in the adversary proceeding of <u>Hoover v. QLS</u>

4    <u>et al.</u>, Adversary Proceeding Number 20-04002.

5         Do I have Ms. Henry on the phone for the plaintiff?

6         MS. HENRY:  Yes, Your Honor.  Chris Henry on the

7    phone for plaintiff, Ms. Hoover.

8         THE COURT:  Good morning.

9         Mr. Norman, are you on the phone for PHH?

10        MR. NORMAN:  Yes.  Good morning, Your Honor.  Robert

11   Norman.

12        THE COURT:  And I guess you're on the -- you're

13   representing HSBC Bank as the trustee --

14        MR. NORMAN:  Yes.

15        THE COURT:  -- and the -- and NewRez, as well,

16   correct?

17        MR. NORMAN:  Correct, Your Honor.  Thank you.

18        THE COURT:  Okay.  And Mr. Joseph McIntosh for --

19        MR. JOSEPH MCINTOSH:  I'm here, Your Honor.

20        THE COURT:  -- QLS.  All right.

21        MR. JOSEPH MCINTOSH:  Yes, Your Honor.  I'm here.

22        THE COURT:  And Mr. John McIntosh for IH6 property.

23        MR. JOHN MCINTOSH:  I'm here.

24        THE COURT:  Okay.  All right.  So I guess I will

25   start with you, Ms. Henry, if you want to say anything further

1 in addition to what was in the pleadings. And one of the

2 things that I would like you to address is just where you see,

3 if any, material issues of fact relative to the other motions

4 for summary judgment.

5          MS. HENRY: Okay.

6          Your Honor, today, we ask the Court to find that the

7 defendants have willfully violated the automatic stay, and then

8 Ms. Hoover should be granted partial summary judgment on

9 liability with damages to be determined at trial.

10         There are three key reasons that the Court should

11 rule in the Hoover's favor. No matter how the Court looks at

12 the issue, her home is property of this bankruptcy estate. The

13 foreclosure was done in violation of the automatic stay, and

14 the violation was done willfully by all defendants in this

15 case.

16         First, as the Court evaluates this case, it's

17 important to remember that the definition of what is property

18 of the estate is broad, and exclusions under 541 are

19 interpreted narrowly. Second, once this Court determines that

20 Ms. Hoover's house is property of the estate, a foreclosure of

21 that house necessarily violated the stay. Third, liability for

22 a violation of that automatic state only requires that the

23 actions of defendants were willful, which does not require

24 knowledge of Ms. Hoover's bankruptcy filing prior to the

25 foreclosure sale or that Ms. Hoover's bankruptcy is now -- or



1 the fact that Ms. Hoover's bankruptcy is now closed.

2        The main facts for determining whether the property

3 is property of the estate and whether the stay is violated, as

4 far as the plaintiff is concerned, are issues that are not of

5 any material fact.  It is undisputed that PHH had knowledge of

6 Ms. Hoover's bankruptcy prior to the sale, and they also had

7 knowledge of -- that the sale was invalid after the sale, when

8 they confirmed that she was a successor-in-interest to the

9 property.  And that is an undisputed fact here.

10        It's also undisputed that QLS was aware of the

11 bankruptcy as early as the 24th of September, which was several

12 days after the sale, 11 days after the sale.  And they still

13 had ability to have stopped the sale when they affirmatively

14 knew about it, but they chose to send that trustee sale -- the

15 sale deed ahead of time, and they believe that that shelters

16 them from liability.  We do not believe it shelters them from

17 liability because regardless of whether or not that trustee's

18 deed was sent to the third-party purchaser, they always had the

19 ability to come to the Court, notify the trustee that a sale

20 was held in violation of the foreclosure, and also to notify

21 PHH that Ms. Hoover had filed the bankruptcy and that this sale

22 was invalid.  Because QLS always knew it was invalid, and they

23 instead chose to egg on IH6 to bring a motion to annul here, as

24 opposed to being a party that was neutral.

25        IH6 also claims that they had no knowledge about the

1  bankruptcy.  They may not have known about the foreclosure
2  actually before the filing, but they certainly were on
3  constructive notice that Mr. Suleiman had passed away in 2015.
4  There was a nonprobate estate that had been filed, and as a
5  third-party purchaser, in part of their due diligence, they
6  would have known that there was a sale -- I mean, there was a
7  will that had a pour-over provision into a trust and that
8  Mr. Suleiman was deceased.  And then, when they later on found
9  out about Ms. Hoover's bankruptcy, which we have conclusive
10  records it was prior to October 23rd and they have told the
11  Court otherwise, they chose to again do nothing and pursue
12  Ms. Hoover to actually rent her own home.  They also told her
13  that to rescind the sale would be a big cost of over $100,000,
14  they were not interested in doing.  They also chose to do
15  nothing.

16          And when Ms. Hoover's attorney attempted to mitigate
17  the damages here, get all parties on board, try to figure out
18  what we could do to rescind this, to resolve the situation, and
19  to at least have all parties at the table because there was
20  quite some effort in getting a hold of PHH, no party that was
21  corresponding with the debtor's attorney would agree to
22  affirmatively get PHH into the conversation and affirmatively
23  find out whether or not PHH knew about the sale prior to the
24  bankruptcy, which they did.

25          The other issue here, of course, is whether or not



1 this is property of the estate.  We think that this issue is
2 fairly clear that whether or not there's a spendthrift trust
3 here is irrelevant because under bankruptcy law and the <u>In re</u>
4 <u>Findley</u> case, in bankruptcy, only the portion of a trust that
5 has accrued and is ready for distribution to the beneficiary in
6 subject to seizure, which means that creditors could get at
7 that portion of the trust.  Here, it's unequivocal that the
8 property at issue was meant to be distributed to Ms. Hoover,
9 and it accrued immediately upon his passing in (indiscernible)
10 will when that property came into the trust, and a bankruptcy
11 court and the trustee would have access to that property in the
12 bankruptcy.

13          I'm not sure why Washington State bankruptcy --
14 Washington State cases on trust law and spendthrift trusts has
15 not been evaluated by the defendants, but to the best of my
16 knowledge, our arguments have not actually been addressed at
17 all.  They haven't been refuted.  We think that there is no
18 issue of material fact here for the Court should determine
19 those issues, whether or not this is property of the estate,
20 whether or not an automatic stay was violated, and then also,
21 as I've just pointed out, whether or not the actions of the
22 parties were willful.

23          Willfulness, as I've explained in my brief, does not
24 mean that you had knowledge prior to the bankruptcy.  It means
25 that once you found out about the bankruptcy, you know, before

1   or after, you took no action to remedy the stay violation. The

2   law in the Ninth Circuit is very clear under the <u>Sternberg v.</u>

3   <u>Johnson</u> case that they -- creditors have an affirmative duty

4   once they know about the stay violation to remedy their actions

5   and right the stay. It's also clear that if a bankruptcy has

6   been closed, it does not mean that a stay violation has not

7   taken place. It needs to be remedied. And that also seems to

8   be an issue here being argued by the defendants.

9        Lastly, the -- Ms. Hoover is asking here for partial

10  summary judgment and that damages be something that is

11  determined at trial. We certainly have made a showing that she

12  has damage to her property in that the sale has happened on her

13  house and that she has been incurring bankruptcy -- she's been

14  incurring attorneys' fees to determine that willful violation

15  has taken place and in litigation. And under 362(k)(1), those

16  are actual damages under the statute.

17        We also ask that this -- there be a ruling that the

18  joint and several liability among the defendants here. And to

19  the Court's question as to whether or not there's an issue of

20  material fact, it is our position that there's -- to the extent

21  that there are factual issues here, those issues go to the

22  weight of damages among the parties, the weight of damages that

23  are part of the automatic stay, and that depends on when each

24  party learned about the automatic stay, what action or inaction

25  is taken, and the extent of their liability.

1  And so we do not believe that there is an issue that
2  the Court would have to determine for the plaintiff's position
3  for determination of stay violation.

4  And we think those are the issues to discuss today --
5  THE COURT:  So --
6  MS. HENRY:  -- as far as the plaintiff's motions.
7  THE COURT:  -- if you could address -- because I
8  think you've taken the position that with regard to the
9  annulment of the stay, that there are issues that require a
10  hearing.  Can you address that?

11  MS. HENRY:  As far as an issue of annulment for the
12  stay, Your Honor, under 362(b), there is a significant amount
13  of equity in this property.  There's $167,407.96 that was
14  distributed into the court's registry.  There's no issue here
15  that this property would have been something at the time that
16  the estate of the bankruptcy would not have allowed to have
17  gone into a relief from stay type of situations or an
18  annulment, for that matter.

19  The creditor, I mean, IH6 here is the only one asking
20  for an annulment of the stay.  PHH has not asked the Court for
21  annulment of the stay.  They are the creditor.  And that's
22  because they can't ask for an annulment of stay.  They received
23  actual knowledge of the stay violation.

24  And IH6, in order to win on their motion to -- on
25  their motion to annul, has to prove that the creditor here



1  didn't -- did not commit a stay violation or -- I mean, sorry,

2  that the creditor here did not receive actual knowledge and

3  that somehow they would meet the standards of the motion to

4  annul.  And they can't do that in this situation.  They clearly

5  knew.  And so even thought IH6, as a third-party purchaser, has

6  standing because they have rights in the property, their entire

7  claim relies on the actions of PHH.

8          And we have a situation here where PHH is not asking

9  to annul the stay.  They've got an issue, and if that's not an

10 issue that this Court thinks is that the heart of it, then they

11 have to get around the fact that they never inquired with PHH

12 as to whether or not they had knowledge.  They never inquired

13 about those issues.  And yet they have come in with conjecture

14 about Ms. Hoover, which we know is false.  It's been proven in

15 discovery that Ms. Hoover has always used the correct Social

16 Security number.  There was never anything nefarious there, and

17 yet they continue to have that as an issue.  She has never

18 filed another bankruptcy.  She's had one bankruptcy.  Most of

19 the annulment cases revolve -- involve people that have had --

20 that are repeat filers.  That is not relevant here.  She has

21 acted in good faith and diligently through the entire case.

22 She did everything within her knowledge and power to

23 communicate with PHH about the bankruptcy, and as a lay

24 person -- and the information that she was being given in this

25 case, she told the entity that she understood she had to tell

1 to stop the sale.

2 So the fact that QLS, who is not a creditor, was not

3 given knowledge of whether or not she filed bankruptcy, I don't

4 think is an issue at all. They were -- the fact that QLS's

5 clients, PHH, didn't give QLS information about a bankruptcy

6 filing that they knew about as early as the 9th or 10th of

7 September, when the sale was on the 13th, is an issue that,

8 again, the parties should have with PHH, not with Ms. Hoover.

9 So that the classic issues of why a court would annul

10 a stay are just not here. And those are unequivocal. And the

11 court looks at the balance of equities. The -- I'm not even

12 sure how I say the name, the <u>Felstead</u> case here is just a

13 number of factors that were determined by a court. No one

14 factor is more important than the others. And I think that

15 there are many factors here that the Court can determine that

16 do not need an evidentiary hearing because they weigh stronger

17 than others.

18 There's not a repeat filer. She acted in good faith

19 to communicate about the bankruptcy discharge. She was filing

20 bankruptcy to stop the foreclosure. Once she found out she had

21 no way to stop the foreclosure, she let the case dismiss

22 because what was the point anymore. She had lost her home and

23 needed -- did not understand that she could do anything until

24 finally she got a bankruptcy attorney to help her.

25 So that's where we stand on that issue. She's lived

1  in this property, always had, had every intention of keeping

2  it.  She also had the ability to follow through with the

3  bankruptcy.  Arrearages were not that high, and the idea that

4  somebody who had $167,000 of equity in their house was trying

5  to do something to lose a house and the equity just is not

6  something that makes any sense at all.

7      So I hope that that answers your questions.  And if

8  you have any others, I'm happy to answer them.

9      THE COURT:  All right.  So it's your position that I

10  can decide this without a hearing, decide the issue of

11  annulment without a hearing.

12      MS. HENRY:  It is my position that the factors that

13  weigh most greatly can be determined without hearing.  Now, if

14  the court doesn't agree with that and feels that the balance of

15  the equities need more, then a hearing would be determined.

16  But it is our position in the hearing should not be necessary.

17      THE COURT:  Yeah.  I'm not taking a position one way

18  or the other.  I'm just trying to understand the parties'

19  positions at this point.  Okay.  Thank you.

20      Anything you want to say about -- anything else you

21  want to say about the -- and I will let you do a reply after

22  everyone else's, but is there anything else you want to say

23  up-front about the other motions other than what you have in

24  the pleadings for summary judgment Before I let the other

25  counsels --



1    MS. HENRY:  I do want to point out to the Court that,
2  you know, there's been -- some of the other motions are relying
3  on affidavits that are now clearly incorrect.  Ms. Hoover did
4  not give wrong information about her Social Security number.
5  She always uses her correct Social Security number.  That has
6  definitively been known and confirmed by QLS as early as
7  January, yet nothing has been done to change those -- I mean,
8  those declarations.  IH6 also knew about this bankruptcy far in
9  advance of the date that they put in their declarations.  I
10 think that those are important things that the Court should be
11 aware of here.

12    And there also is no information before the Court
13 that Ms. Hoover is a sophisticated person that would know how
14 to transfer title of property or understand the issues of a
15 trust being in her name or not in her name.  And the fact that
16 she has had a company that bought some properties at
17 foreclosure sale whose information was done through an escrow
18 agent doesn't change that fact.  So I would also put that
19 before the Court.  But I do believe I will leave any other
20 issues in a response to their arguments.

21    THE COURT:  All right.

22    All right.  I'm going to turn to QLS next.

23    MR. JOSEPH MCINTOSH:  Thank you, Your Honor.  Joe
24 McIntosh for Quality.  This is Quality's motion for summary
25 judgment and dismissal from the adversary case.  The single



1 claim against Quality in the adversary is that Quality
2 willfully violated the stay when it foreclosed this property.
3 There's no other claims against Quality. And this Court will
4 recall that we pretty early on from this case filed a motion
5 for summary judgment, and I think we had a hearing back in May,
6 maybe it was April, and we put forth evidence that Quality did
7 not know about this bankruptcy when it went to sale. And the
8 plaintiff/debtor opposed Quality's motion and requested a
9 continuance of the motion to do discovery to inquire as to
10 whether Quality did, in fact, have presale knowledge of the
11 bankruptcy, specifically, the communications between the lender
12 and Quality, to try and see if there was some notice given to
13 Quality. And the discovery concluded with no evidence that the
14 lender told Quality about the bankruptcy and no evidence that
15 Quality otherwise had knowledge that the bankruptcy prior to
16 sale. And so that's where we are today.

17 There is no -- there's nothing in the record that
18 shows the Quality knew about the bankruptcy. And I thought I
19 heard counsel mention that knowledge doesn't matter as to a
20 willful violation. That's simply not true. The parties
21 that -- party that willfully violates the stay must have
22 knowledge, and Quality does not. And frankly, I think Quality
23 should have been non-suited when counsel confirmed the Quality
24 had no presale knowledge, but they were not.

25 A couple items real quickly, Your Honor, that I heard

1  counsel mention, the first being that Quality gave the
2  trustee's deed or conveyed or delivered the trustee's deed
3  after finding out about the bankruptcy, that's just not true.
4  They learned about the bankruptcy --

5          THE COURT:  I thought what she said was that you
6  accelerated delivery of the deed.

7          MR. JOSEPH MCINTOSH:  Accelerated deliver of -- I
8  don't know what that means, but --

9          THE COURT:  I'm just -- she can clarify when she
10  comes back, but that's how I heard it.

11          MR. JOSEPH MCINTOSH:  Okay.  Well, the record will
12  show that the deed was delivered to the purchaser, and Quality
13  subsequently learned about the bankruptcy.  So I think that
14  we're on the same page there.

15          Another item I heard counsel mention -- and she's
16  mentioned this in pleadings before, which she says that Quality
17  needed to give notice to the Court, and I'm still at a loss as
18  to what notice -- or what obligation Quality had to give notice
19  to the Court and what said notice was supposed to say.  And
20  procedurally, I'll remind this Court that the lender and the
21  beneficiary have, at all times, maintained that the sale was
22  proper.  And they had put the issue before the Court -- whether
23  the sale is proper, they put that issue affirmatively before
24  the Court.  So I still am at a loss as to what notice Quality
25  did not provide to the Court in connection with the other

1  parties.

2      And I also remind the court that we were neutral to

3  that earlier adjudication about whether the stay applied.  We

4  did not take sides with the lender and the purchaser, as

5  counsel seems to suggest, and the Court had ample notice.

6  Again, there was a motion very early on.  In fact, it predates

7  this lawsuit, a motion to determine whether that sale was

8  proper or not, with the beneficiary and the lender very

9  strongly maintaining that the sale was proper.

10      And then -- bear with me a second.

11      Okay.  And then, there was one -- I'm looking at my

12  notes here -- one more item that counsel mentioned is that

13  Quality knew that this sale violated the stay.  Again, that's

14  simply not true.  We don't know.  And I'll remind the Court

15  that when we had that earlier motion, the Court was unable to

16  rule whether the stay applied or not.  I don't know if the

17  Court is going to do that on this motion, but we've had many

18  months have lapse where we don't know what the legal outcome of

19  this sale was.

20      And then finally, Your Honor, there's a theory that's

21  not briefed at all about Quality being vicariously liable with

22  the co-defendant.  And I think some of the pleadings referenced

23  this liability arises under agency.  There's no evidence in the

24  record that demonstrates Quality is an agent of its

25  co-defendant.  And furthermore, as I'm sure this Court is

1  aware, agents aren't liable for the actions of principals.

2  It's typically the other way around.  So this is -- this being

3  a summary judgment motion, if counsel wanted to stick Quality

4  with some theory of vicarious liability, she would need to

5  introduce both the evidence and the legal authority in support

6  of that motion, in support of that theory.

7       So to conclude, Your Honor, this is a claim against

8  Quality for willful violation of the stay, i.e. knowledge of

9  the stay when they foreclosed.  The record has no evidence that

10  they were aware of the stay.  Therefore, the claim fails as a

11  matter of law and must be dismissed short of a trial.  Thank

12  you.

13       THE COURT:  All right.  Can you address -- because I

14  think the -- first of all, do you agree that you did have

15  knowledge of the bankruptcy as of 9/24?  There's no dispute

16  there, correct?

17       MR. JOSEPH MCINTOSH:  It was 9 --

18       THE COURT:  When I say "you," I mean QLS.

19       MR. JOSEPH MCINTOSH:  Now, bear with me.  It was 9/24

20  in the afternoon.  They got a call from someone out of state

21  about the bankruptcy without -- my records show it was without

22  any context, without any proof of interest.  But yeah, the date

23  on that, Your Honor, is 9/24/2019.

24       THE COURT:  All right.  I just was trying to

25  establish that there was no issue of fact on that point.



1       All right, thank you.  Anything else?

2               MR. JOSEPH MCINTOSH:  Not from Quality, Your Honor.

3               THE COURT:  All right.  I will go to PHH next.

4               MR. NORMAN:  Thank you, Your Honor.  Robert Norman.

5               Your Honor, what I wanted to add beyond the papers to

6   really narrow the issue, at least from our perspective, is a

7   Washington Supreme Court case, <u>Fidelity Mutual Savings Bank v.</u>

8   <u>Mark</u>, 112 Wn.2d 47, 53 (1989).  And, Your Honor, this deals

9   with title in the state of Washington and our argument and our

10  point that this property, the Bonney Lake property, was never

11  deeded to the trust.  That's undisputed.

12              The case -- I'm reading directly from the case, Your

13  Honor.  Quote:

14              "Title to real property can only be conveyed by a

15              valid, acknowledged deed and the conveyance must be

16              recorded in the county where the property is

17              situated."

18              That's at pinpoint Page 53.

19              Your Honor, it's undisputed that did not happen.

20  It's also undisputed that two other properties that were in

21  this trust were conveyed to the trust, the properties in Kent

22  and Aubrey.  So clearly, the folks that --

23              THE COURT:  I'm sorry, what -- can you repeat that?

24  I -- the last sentence.

25              MR. NORMAN:  Yes.  Yes, Your Honor.

1           The Ali Suleiman Trust really dealt, or attempted to
2   deal, with three different properties, the Bonney Lake
3   property, which is the subject of this case, and the undisputed
4   evidence before the Court is that title was never transferred
5   from Ali Suleiman's name, in his individual capacity, into the
6   trust.  The opposite of that, for two other properties that Ali
7   Suleiman had, one located in Kent, Washington, and one located
8   in Aubrey, both of those properties were deeded from his
9   individual capacity into the trust because that's what you do
10  to transfer property into a trust, pursuant to this Washington
11  Supreme Court authority.

12          Because that never happened at the time this
13  bankruptcy was filed, despite any undisputed facts of actual
14  notice, possessory interest, things like that, Ms. Hoover had
15  no interest to protect with the automatic stay.  So I -- our
16  position -- and this is, you know, throughout the briefs -- is
17  that there was no stay violation for that simple reason.  The
18  analysis ends there.  All of the discussions about loss
19  mitigation, payments, et cetera, none of that is material to
20  deciding whether this was property of the estate when she filed
21  that bankruptcy.

22          And, Your Honor, I --

23          THE COURT:  The language -- because you focus on
24  title, which I understand why you're focusing on title, but the
25  language of the Bankruptcy Code talks about an interest of the



1 debtor in property. Are you taking the position that she had

2 no interest under the undisputed facts of this case?

3       MR. NORMAN: Your Honor, we're taking the position

4 that she had no legal title interest. You know, even if she

5 had a possessory interest, she didn't have a title interest.

6 For example, a tenant filing bankruptcy or an occupant filing

7 bankruptcy, that's not going to stop a foreclosure on a piece

8 of property. It may stop them from being evicted until relief

9 from stay is obtained, but it doesn't impact legal title. I

10 believe that was briefed in the papers. But yes, that's our

11 position.

12       THE COURT: So what changed between the time that she

13 was made -- was confirmed as a successor-in-interest and the

14 time of the sale?

15       MR. NORMAN: Nothing changed, Your Honor, with

16 respect to title. It is my understanding, months after the

17 bankruptcy was filed through her counsel, I believe she did

18 provide the paperwork that PHH was requesting just to identify

19 her as a confirmed successor-in-interest, items like providing

20 the will and other information, but the -- I really think

21 that's a non-material issue because that was done, I think,

22 three months later in, I want to say December of 2019. The

23 area -- the timeline that we're focusing on is what she's

24 contending violated the stay. It's that foreclosure sale that

25 happened in September, four days after she filed, you know, the



1  bankruptcy.

2       THE COURT:  And so it's your position that a

3  beneficiary under a deed of trust that has knowledge of a

4  party's asserted interest that -- and that has control of when

5  somebody becomes a confirmed successor-in-interest has no duty

6  until the title is -- to take any action if they're aware of a

7  bankruptcy?

8       MR. NORMAN:  Your Honor, I think that's right.  Had

9  title been transferred from Suleiman into the trust prior to

10  that bankruptcy, we'd have a stay violation, but that's not --

11  those aren't the facts.  And it's clear from the facts that

12  they knew how to do that, and either by mistake or otherwise,

13  it just didn't happen for this property.  And as a result, all

14  sorts of other safeguards that are in place to stop this type

15  of a situation from happening weren't engaged, for example, you

16  know, before foreclosure sale happens.  And I think this is in

17  Quality Loan Services' briefing, right?  They check title, they

18  pull title to see has anyone filed bankruptcy before we go to

19  sell.  Nothing came up because of this property was not in the

20  trust nor was it in her name.  It was in the deceased's name,

21  so Mr. Suleiman, that there was no title interest to protect.

22       And that's not my client's fault.  That's an issue

23  that, you know, that -- that risk of loss, however, we want

24  articulate it, falls with either Suleiman or Hoover, but it's

25  not a stay violation.



1        THE COURT:  Okay.  All right.  And there's no
2  material issue of fact relative to what's been put forth by the
3  plaintiff in terms of when your client was at least aware that
4  there was a bankruptcy, correct?

5        MR. NORMAN:  Not that I'm aware of, Your Honor.

6        THE COURT:  All right.  All right.

7        I'll turn to IH6 then.

8        MR. JOHN MCINTOSH:  Thank you, Your Honor, John
9  McIntosh on behalf of IH6.

10        We have moved for summary judgment on three issues.
11  I believe the first is that there was no -- the property itself
12  did not become property of the bankruptcy estate.  It's really
13  based on two arguments here.  There was a spendthrift provision
14  in the trust agreement.  The trust agreement controlled that
15  property.  The property was part of the trust at all relevant
16  times, and the legal owners were the trustees of that trust.
17  So the terms of the trust agreement governed that trust
18  agreement was not on the public record.

19        Something that Ms. Hoover's counsel mentioned earlier
20  for the first time is that IH6 had constructive knowledge.
21  That argument was not made in the briefings, but that is not
22  the case.  IH6 did not and could not have had constructive
23  knowledge because when Ali Suleiman died, the nonprobate action
24  documents did not have the trust agreement.  It had a will with
25  a pour-over provision but did not disclose on the public record



Case 20-04002-MJH   Doc 120   Filed 04/13/21   Ent. 04/13/21 13:25:07   Pg. 22 of 36

that Sarah Hoover had any interest in this property whatsoever. Constructive knowledge did not exist here before the sale, before the trustee's deed was issued, before the trustee deed was sent for recording, and before the notice to vacate was posted on the door. IH6 did not have any knowledge of Sarah Hoover's interest in the property or her bankruptcy filing.

So the first issue and the first argument that we are saying is proper for summary judgment -- there's no issue material fact, we don't need to go any further -- is that this property was not property of the bankruptcy estate. The stay did not apply, and the sale should be validated on those grounds.

And the second issue is if there is any type of stay that is determined to apply, we are requesting that the stay be annulled. And it's a balancing of factors set forth in Felstead. There's not one factor that is determinative. The fact that, you know, Ms. Hoover's counsel states that we must prove that PHH didn't have knowledge of the bankruptcy in order to annul the stay, that's not the case. It's a balancing of factors and the equities.

The facts here are that Ms. Hoover's a sophisticated real estate professional. She purchases properties at trustee sales. She knows the roles of the parties. She was represented by counsel when she started administering the trust with her brother as co-trustee of the trust. She maintained a



separate bank account. She filed tax returns on behalf of the trust. She kept the formalities in place for a reason. She was being sued. She was taking loans from hard money lenders, Eastside Funding, throughout this entire time from 2016 to the present. She had financial difficulties. She was being sued by Halshaw Properties (phonetic), who was seeking to pierce the corporate veil, and she was protecting her, quote, "equity" in the property by leaving it in the trust. And that was done intentionally by her. And that's the -- set forth. That's something that she answered affirmatively in her deposition transcript.

As the trustee of the trust with legal title to the property, she had -- she and her brother are the ones who had standing to assert and -- to assert any claim or claims on behalf of the trust property. Beneficiaries do not, but the beneficiary has an interest in the trust, but not an interest sufficient that it would come into the bankruptcy estate.

The -- then, we move forward to the events leading up to the sale and the bankruptcy filing. The -- PHH, in one of the declarations -- and I think it's pretty telling -- their assumption package told Sarah Hoover something very specific. It told her, this is how you provide us with sufficient proof that you've -- you are the successor-in-interest, that you are the owner. You need to provide us with -- I apologize. One second, Your Honor.



1          All right.  Docket 64, Page 53, it indicates:

2          "Were you transferred the property through deed?  Did

3          the court issue an order, decree, or other document

4          related to the disposition of the borrower's

5          property?  Did the borrower have a will?  Did you

6          acquire an interest in the borrower's real property?

7          And it goes on to say is, "Once we've determined how

8  you acquired an ownership interest, we will then provide you

9  more individualized lists of accessible documentation."

10          That's a request for proof of successor-in-interest

11  dated March 21st, 2019.  That never happened.  Those

12  requirements are -- reflect state law.  You need a deed to

13  convey real property in the state of Washington.  This is what

14  Ocwen was getting at.  This was intentionally never provided.

15          So there's a reason.  There's -- you know, this is --

16  reasonable inference can be made here that Ms. Hoover took

17  intentional actions to make sure that title was not in her

18  name.  Title did not -- was not available to be viewed by a

19  creditor.  She was concealing this interest in the property,

20  and that continued with her applications that she submitted,

21  which intentionally did not reflect her -- what she's claiming

22  today, which is a different position.  She's claiming a

23  different -- something different than what she -- her position

24  taken pre-bankruptcy.

25          So leading up to the sale, she was communicating with

1  Quality directly, did -- took no -- but took no steps to notify
2  Quality of her filing.  She claims she did that because she
3  didn't understand the rules of the party, but as we can -- as
4  the undisputed evidence shows, she knows the roles.  She's
5  purchased properties from trustee sales, three of them at
6  least, since 2016.  She knows the roles of the parties.  She
7  can't claim that she doesn't know the role of parties.  She
8  doesn't tell Quality that the -- of our bankruptcy filing.  She
9  lets this happen.  Then, she waits.  She doesn't do anything
10 until after the deed is recorded, and then she engages with IH6
11 after the notice to vacate is posted and she engages with them
12 and talks about leasing the property from them.

13        Docket 73-17 is a document, an email from Sarah
14 Hoover to Jacqueline Rumins (phonetic).

15        "Hi, Jacqueline, I've been trying to get in touch
16        with you regarding the property located at the
17        address above.  I would like to try and make
18        arrangements with you.  Would you give me a call or
19        email me?  I am available by text, phone number.
20        Thank you, Sarah Hoover."
21        This is dated November 16th, 2019.

22        What -- to whatever extent that Ms. Hoover is now
23 claiming that we had -- we were being demanded to unwind the
24 sale and do -- take some action anytime before or on the date
25 of November 16th is absurd.  There -- Sarah Hoover was trying



to make arrangements to be a tenant in the property post-sale
with IH6.  IH6 didn't have a knowledge of any demand by
Ms. Hoover to unwind the sale.  And in the same vein, it's --
you know, as -- you know, Quality points out, it's what -- I
mean, this property wasn't in your name -- wasn't in
Ms. Hoover's name, so it's not clear what exactly the demand on
behalf of Sarah Hoover individually was.  If it was her as the
trustee of the trust, that would make more sense, and certainly
that's something that needs to stay consistent throughout this
case.

The bankruptcy filing was frivolous, was done in bad
faith.  There was a skeletal filing.  No application for
installments to make payments by installments, indicating under
penalty of perjury that she didn't have sufficient funds to
make the full filing fee was submitted to the bankruptcy court.
Not a single other filing was made, and the case was dismissed
on September 26th.  And then, the debtor took substantial steps
and aggressively demanded, without bringing this Court
before -- bringing this case before this Court, demanded that
the sale be unwound, you know, without taking further court
action.      There's -- the surplus funds in the court
registry, I think, is notable because the proceeds of the sales
of the other two trust properties went to the trust estate.
Those surplus funds are property of the trust.  What happens to
those funds, it's not clear, but this bankruptcy filing, you

1  know, the equity -- it's not -- Ms. Hoover is not claiming and

2  can't claim that she's losing equity in the home, and the

3  surplus funds, she has not established -- you know, she has not

4  come before this Court with -- as trustees of the trust or her

5  individually and established that that's -- that those funds,

6  which represent the equity in the property, are -- belong to

7  her.  If they do, then that -- those surplus funds are

8  presumably available to her creditors.  But the equity has been

9  preserved, and it's in the court registry.  So that it would

10 weigh in favor of validating the trustee sale.

11         And finally, the last issue I want to touch base on

12 is there's no conduct of IH6 that would have violated the stay.

13 Moving to reopen the bankruptcy and to annul the stay is not,

14 itself, a stay violation.  And that is the only conduct that

15 Ms. Hoover is alleging here.  I mean, she repeatedly says that

16 to the extent we were damaged, where -- you know, we're not an

17 adversary is what she says in her complaint.  She doesn't have

18 a legitimate claim of a willful violation of stay against IH6,

19 and that -- the complaint -- the amended complaint should be

20 dismissed with prejudice as to IH6.  Thank you, Your Honor.

21         THE COURT:  All right.  Ms. Henry.

22         MS. HENRY:  Thank you, Your Honor.

23         First thing I want to address is that I believe IH6

24 and QLS have taken the position that this is all about whether

25 they had knowledge of the -- of Ms. Hoover's bankruptcy prior

to the foreclosure sale. That is just not the law in the Ninth
Circuit. The Ninth Circuit is very, very clear.

First of all, if the property was sold, it is a stay
violation. Then, the question is whether or not it was
willful. And willfulness can be determined even if actual
knowledge of a bankruptcy that was filed before the foreclosure
sale is known after the bankruptcy. The issue is whether or
not affirmative action was taken to remedy that. And we have
put forth evidence to the court that QLS knew on the 24th and
that IH6 knew prior to October 23rd that they had a sale that
was not valid. And they continued to then, instead of trying
to fix it, go and tell Ms. Hoover that she could rent her own
house. How is she supposed to know? But they knew that they
had an invalid sale.

QLS also did take sides. They're saying that they
were -- they didn't take sides. We have presented proof to
this Court that the -- Ronald -- or Robert McDonald from QLS
was having regular communications with IH6's representative,
Mr. Lappano. You know, you've got to go and validate the sale.
You've got to get this sale annulled with the bankruptcy estate
in order to have it be a valid sale, egging them on to do this.
Are they egging on PHH and telling them that there's an invalid
sale and that, you know, the debtor keeps asking them to
rescind? No. that's not what's happening here, Your Honor.

And when the attorney becomes involved, IH6 is

telling you the Court that they waited to do something.  The
debtor's under an obligation to mitigate damages.  The debtor's
under an obligation to put everybody on notice, clear notice of
the issues, which is what was done here.  And there was much
effort taken to engage with the parties and to make sure all
parties were clear on the issues and to make sure that if there
were any issues that were unclear, that they were resolved so
that everybody could understand what the issues were.  And then
if we couldn't make an understanding, it was going to go to
court.  We've been very, very clear about that.  The idea that
that they were dragging their feet was not the case.  We're
under an obligation to mitigate, and that's what was done here.

        And then also, as far as PHH's argument about title
to the property, that may be state law.  That's not bankruptcy
law.  Bankruptcy law is very clear.  It's all interests and --
legal interests and -- is property of the estates.  It's very
broad under 541, and any exceptions are considered narrow.
I've never heard an argument before that an heir to a property
when the person who's the title owner is dead, that there is no
interest for any other party that might have -- might be a
devisee of that property.  And that seems to be the position
they're taking, which just doesn't jive with bankruptcy law at
all because it certainly would be preventing creditors from
getting at assets, and it also be preventing debtors from



1  protecting assets that they have interests in.

2         I also didn't understand -- IH6 made a point about

3  Ms. Hoover affirmatively saying something at deposition.  I'm

4  not sure what evidence he's referring to, but I don't know of

5  any evidence in the record that she said that she affirmatively

6  was preventing creditors from getting at assets.  I think we've

7  been very clear as to her understanding and misunderstanding of

8  various issues of how trusts and her interest in the property

9  and how to let PHH and others know about her interests.

10        And I also want to point out here that in the

11  response to PHH and IH6's motion for summary judgment, we've

12  clarified that in May, Ms. Hoover was asked to specifically by

13  Ocwen, the processor-in-interest to PHH, to give specific

14  documents.  She turned them over.  She thought that she'd done

15  everything, was told to get the death certificate, the

16  homeowner's insurance quote, driver's license, the page of the

17  trust showing the property address, and the affidavit that she

18  was the co-trustee.  She was waiting for communication about

19  anything else.  Then, there was a transfer between Ocwen, and

20  PHH then became the owner and heard nothing.  And eventually,

21  when she gets back with PHH, she's told to reupload documents

22  onto their portal loan solution center.  And the deposition, it

23  was clear that PHH's representative has no idea what was sent

24  up to the portal or what was not sent into the portal because

25  he never looked at that information.



1      So it's unclear whether Ms. Hoover was told to give

2 the documents that would have been enough.  And she was not --

3 didn't have any understanding that she hadn't given everything

4 that was enough.  And by the time she'd received a letter in

5 August, early August of 2019 that there was other information

6 needed, then she was told that, oh, too late.  We're too close

7 to the bankruptcy, and you can't do anything now.

8      THE COURT:  Too close to the foreclosure?

9      MS. HENRY:  Sorry, too close to the foreclosure,

10 sorry.  Yes.  Too close to the foreclosure, can't do anything

11 else.  She continued trying.  And then, people that she'd been

12 talking to at the that loan servicer, Ocwen before and PHH now,

13 all of a sudden on the eve of sale refused to give her any

14 valid information.  And then even worse than that, tell her not

15 to worry and give her the idea that everything's going to be

16 fine and that somehow they actually will rescind sale next day,

17 which of course we know that they did not.

18      So I think that's all of the points that I have to

19 make, and the rest of them, I will rest on the briefs.

20      THE COURT:  All right.  Anyone else?

21      MR. NORMAN:  Your Honor, Robert Norman, if I may very

22 briefly.

23      THE COURT:  Okay.

24      MR. NORMAN: I just want to address again the question

25 of whether the foreclosure sale, you know, acknowledging that



1 Ms. Hoover may have had a possessory interest in the property.

2      IH6 did cite the authority I was referring to in

3 their motion for summary judgment.  It's Docket 65, Page 8 of

4 14.  I'm reading from the brief:

5           "A non-judicial foreclosure only affects legal title

6           to the property and not any possessory rights of the

7           debtors."

8      And here, they're citing to the In re Walker case out

9 of Pennsylvania.  But, Your Honor, that goes right to what

10 we're saying.  Under Washington law that we've cited, there was

11 no interest in title because there was no deed from Suleiman to

12 the trust.  Under bankruptcy law, at best, when that

13 foreclosure sale happened, she had a possessory interest, which

14 does not stop a nonjudicial foreclosure that deals only with

15 legal title.  I think that squarely connects the dots as to why

16 there is no stay violation.  Thank you, Your Honor.

17      THE COURT:  All right.  Anyone else?  All right.

18      MR. JOHN MCINTOSH:  Yes, briefly, this is IH6, John

19 McIntosh on behalf of IH6.  I just need to address one quick

20 thing by counsel about saying that IH6 knew conclusively and

21 there's evidence that they knew of the bankruptcy on September

22 23rd, 2020.  There's no evidence of that in the record.  That's

23 just -- that's false.  The declaration of Michael Lappano filed

24 in the main case says that it received notice of the bankruptcy

25 and Sarah Hoover's interest in the property for the first time



1  on November 22nd, 2019.  So that's the evidence that we are

2  submitting, and that is absolutely contested.  I don't know

3  what evidence she's pointing to about the 9/23/2019 date.

4  Thank you.

5          THE COURT:  All right.  Ms. Henry, you want to --

6          MS. HENRY:  Your Honor, if I could --

7          THE COURT:  -- you want to address that?

8          MS. HENRY:  If I can clarify.  In our response to the

9  summary judgment by PHH and IH6, we included emails by Robert

10 McDonald about his communications with IH6 and saying that, "I

11 have communicated with the third-party purchaser.  They do not

12 want to unwind the sale.  I let them know that they need to get

13 the sale annulled.  I've let them know that they should hire

14 counsel.  Mr. Lance Olson is not available, so I'm going to

15 have them talk to John McIntosh."

16         MR. JOHN MCINTOSH:  That's -- I object to all that

17 evidence if that is somewhere in the -- in this record as

18 hearsay.

19         MS. HENRY:  Well, that evidence is in the record.

20         MR. JOHN MCINTOSH:   Well, it's hearsay.

21         MS. HENRY:  And again -- let me just finish,

22 Mr. McIntosh.

23         There's also emails there by Mr. Lappano that's

24 responding.  So I believe that he is your client.

25         But in any case, to the extent of whether or not we



1  agree on the dates that they knew or did not know, that is not

2  100 percent conclusive here.  The fact is that they did know,

3  and it just goes to the damage issue, as to whether or not

4  their damages are greater or less because they knew earlier or

5  later.  That's all I wanted to clarify, Your Honor.

6           THE COURT:  All right.  Anything else?

7           All right.  Well, obviously, there's -- I'm going to

8  need to take the center under advisement.  I appreciate the

9  arguments of counsel and the extensive briefing.  And it may

10 take me a couple of weeks to get something out.  And obviously,

11 if there -- there's going to be a need for -- well, there

12 likely will be a need for further status conference is my

13 guess, but I don't know that for sure at this point.  But we

14 will be in -- include any future status conference if one is

15 necessary in the memorandum decision on the summary judgment

16 motions.

17          And I appreciate counsel's time and arguments.  Thank

18 you.

19       (Proceedings concluded at 9:59 a.m.)

20                    *  *  *  *  *

21

22

23

24

25

1 **C E R T I F I C A T I O N**

2

3       I, Alicia Jarrett, court-approved transcriber, hereby

4 certify that the foregoing is a correct transcript from the

5 official electronic sound recording of the proceedings in the

6 above-entitled matter, and to the best of my ability.

7

8

9

10 _____

11 ALICIA JARRETT, AAERT NO. 428     DATE:  April 8, 2021

12 ACCESS TRANSCRIPTS, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25